ADMIS Complaint - Page 1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

| | |
|---|---|
| SAMANTHA SIVA KUMARAN | &#124; |
| Other similarly situated Customers 1-100 | &#124; |
| Other similarly situated CTA's 1-100 | &#124; |
| Nefertiti Risk Capital Management, LLC | &#124;  Case No: 1:20:CV:_____ |
| , | &#124;  Judge:_____ |
| *Plaintiff,* | &#124;  Related Case: 1: 20:CV:03668 |
| | &#124; |
| -against- | &#124; |
| | &#124; |
| | &#124;  **COMPLAINT** |
| ADM Investor Services, Inc | &#124;  **JURY TRIAL DEMANDED** |
| *Defendant,* | &#124; |

_____

Pursuant to Federal Rules of Civil Procedure ("FRCP") 3, and incorporating by reference the exhibits under FRCP 10(c),  Plaintiffs Samantha Siva Kumaran ("Kumaran"), Customers 1-100, CTA's 1-100, Nefertiti Risk Capital Management, LLC, allege for its complaint as follows:

## PRELIMINARY STATEMENT

1.   This action involves a fraudulent scheme, perpetuated by ADM Investor Services ("ADMIS") for over more than five (5) years to defraud and induce commodities futures customers to open accounts in violation of the Commodities Exchange Act, using predicate acts of wire fraud and violations of the Defend Trade Secrets Act, to disseminate customers' confidential trading accounts, and overcharge unauthorized fees, to the owners, employees and affiliates of a disbarred FCM called Vision Financial Markets, LLC., in interstate commerce, without the customers knowledge, consent and permission

2.   Starting in or around September 2014 and continuing until present date, ADMIS engaged in a fraudulent scheme,  together with the owners of the disbarred  futures clearing merchant Vision Financial Markets, Howard Rothman and Robert Boshnack and various affiliates and entities owned or controlled by the foregoing individuals, collectively ("Vision") together with a network of about 80-100 Vision, and aided by various key insiders at the National Futures Association, to

have   deceive,  and   defraud thousands of commodities futures customers and CTA in the commodities futures markets, who innocently opened accounts at ADMIS.

3.  Dozens of customers and CTA"s including Plaintiffs located in New York City, who inadvertently opened accounts at ADMIS during the period September 2014 until present date, fell victim to a fraudulent and behind the scenes scheme, whereby, ADMIS,  in exchange for financial benefits, sold and/or distributed and gave fully disclosed access to multiple of their confidential customers' and CTA's private futures account data, details of the inner workings of their trading positions, as well as their personal private data, *without the customers knowledge, permission and consent* to Vision's owners, employees, and affiliates.

4.  Further the scheme solicits millions of dollars of unauthorized fees and charges, estimated to total over $50 million dollars, in violation of the Commodities Exchange Act (which are expressly not authorized by the customer or CTA) to be deducted in cash from ADMIS accounts to be used to make personal payments to Rothman, Boshnack and Vision affiliates, across interstate lines in Stamford Connecticut, and other financial benefits, which are fraudulently concealed from customers and CTA's prior to account opening;

5.  Further, after ADMIS deceived and betrayed hundreds of its customers and CTA's by secretively giving Vision's owners, employees and affiliates unlawful access to their confidential trading accounts, and trade secrets, and disseminating their confidential and proprietary trading strategies to their competitors in Stamford CT, ADMIS' CEO Tom Kadlec, on the Membership Committee of the NFA, then facilitated the registration of Vision Investment Advisors, LLC, a direct competitor, as a CTA, having unlawfully acquired all ADMIS' CTA"s trading data in violation of the Defend Trade Secrets Act numerous regulatory compliance laws,  and violation of the CEA. Without limitation, Defendants in bad faith, materially violated NFA 2-4 9061.

6.  This conduct violates the heart of the Commodities Exchange Act, which is to protect market integrity, and to promote principles of fair and equitable trade, and promote fair market competition, and constitutes fraud and deceptive trade practices.

7.   Additionally, the illegal conduct, has allowed the disbarred Vision's owners, employees and affiliates and ADMIS and its conspirators to amass approximately $50 million and continues to amass illegal unauthorized fees and charges, being passed through to ADMIS accounts to fund Vision's new businesses, destroy fair market competition amongst CTA's, and small businesses.

8.   Since the proprietary information was disseminated to and utilized in Stamford, Connecticut, and other branch offices, their actions violated the Defend Trade Secrets Act provides for a federal, private, civil cause of action for trade-secret misappropriation in which "[a]n owner of a trade secret that is misappropriated may bring a civil action ,, . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. section 1831 et seq.  It also constitutes a predicate act for a RICO violation.

9.   As a material part of enacting and covering up the fraud, ADMIS, CEO Tom Kadlec is also an NFA Board Member, curried favor and utilized at least two long standing insider NFA Compliance Officers, who were familiar with the dealings of Vision and had knowingly participated in the fraud to violated NFA Compliance Rules to permit Vision, its officers, employees and affiliates to access customers and CTA's trade secrets, confidential trading records and privacy laws, in exchange for generating millions of dollars of revenue for the NFA.[1]

10. Without someone on the inside of the NFA to condone the rule violations, ADMIS, Vision and the Vision IB's would not have been able to perpetuate the fraud for over five years, and upon belief,  so far the customers and CTA's never found out.  NFA, with full participation in the conduct, willfully in bad faith, as documented herein, failed to enforce its compliance laws.

<div align="center">**JURISDICTION AND VENUE**</div>

11. Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the claims brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*. because they arise under the laws of the United States.

---

[1] 20 CV 03668 DKT 1

12. This Court also has jurisdiction over the subject matter of this action under 28 U.S.C. § l332 because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

13. This Court also has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367(a).

14. Pursuant to 18 U.S.C. § 1965, 28 U.S.C. § 1367 and New York CPLR § 302(a), this Court has personal jurisdiction over any non-domiciliary defendant.

15. Venue lies in this District Court under the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b) as the Southern District of New York is the district where one or more the Defendants reside and because this is the district where a substantial amount of the activities forming the basis of the Complaint occurred;

16. An Arbitration initiated ruled that jurisdiction and venue would be New York, NY. That action has been stayed pending resolution of these matters in this district, and the joint liability of the NFA.

<div align="center">

**PARTIES**

</div>

17. ADM Investor Services, Inc is a Futures Clearing Merchant located at 141 W Jackson Blvd, Suite 2100a Chicago, IL 60604  It is wholly owned by Archer Daniel Midland ("ADM").

18. Samantha Kumaran is a resident of New York City, NY which is within this judicial district. In April 2017 Kumaran became a registered member of the NFA as a Commodities Trading Advisor. Prior to that she was a customer and opened an account as a customer to trade commodities futures in January 2017.

19. Customers 1-100 and CTA's 1-100 are citizens of the United States of America, and are similarly situated to Kumaran, who are also victims of the scheme. They opened accounts with ADMIS after September 2014, and were fraudulently induced by former Vision IB's  and remain unaware their confidential accounts and millions of dollars have been disseminated to Vision.

20. Nefertiti Risk Capital Management, LLC was a minority women owned small business, sole proprietor and LLC, in New York NY that was a direct competitor of Vision. It was also a registered CTA. ADMIS, Vision and NFA, depleted its assets, property and trading strategies, to make the company un-operational, in deliberate and direct unfair competition, for Vision to destroy its competitors, in the scheme herein. Kumaran is the legal successor and assign of the LLC.

## PLAINTIFF TRADE SECRETS

21.  Samantha Siva Kumaran ("Kumaran") is a British born, US Citizen residing in New York City, NY. Kumaran earned a First Class Masters and Bachelors, in Applied Math and Theoretical Physics from the University of Cambridge, UK.

22.  Over the course of two decades, she is the sole owner and developer of analytical solutions, risk management software, and trading algorithms since 1993. Until entering the commodities futures industry in or around later 2016, Kumaran self-started a risk management software and services consultant in New York City. Her risk management strategies are trade secrets.

23.  As a solopreneur, she  has consulted for a large companies, Fortune 500 companies and other clients, including Credit Suisse First Boston, AIG, Spectron Oil, FEA, Niagara Mohawk Energy Marketing, Nomura Securities, Manitoba Hydro, ABN Amro, JPMorgan, Duke Energy Field Services, Enron, Bristol Myers Squibb, Louis Dreyfus Commodities, Nexant, Fuji Securities, Market Arts Software, Risk Advisory Canada, Blue Rock Energy, Giro Credit, UMS Advisory and Winhall Consulting.

24. In 2018, Kumaran was featured as a Top 10 Enterprise Trading Risk Management ETRM risk management service provider and solution in CIO Insights

25. During the period 2011 until present date Kumaran, as the sole owner and inventor, of trading algorithms, specifically designed for the commodities options markets, and are designed to give her a competitive advantage both in risk management as well as a CTA. The options modules are in direct competition with the programs that Vision was disbarred for.

26. In 2016 Kumaran took the Series 3 exam and in April 2017 Kumaran became a registered CTA. As with all CTA's, their trading strategies and algorithms are considered trade secrets, derive independent value from not being known, and are designed to give a CTA a competitive advantage to generate substantial returns and accumulate AUM from its secret sauce.

27. NFA rules, including NFA 2-24 9061 acknowledge the competitive value of a CTA's transaction record, stating it is expressly forbidden for an NFA Member to obtain those records without a CTA's permission.

28. Kumaran's CTA trading programs can be summarized as quantitative commodity options trading strategies that seek accelerated capital appreciation in short time frames, through the active trading of exchange-traded commodity options and provide a competitive advantage. Successful performance enables the investor to accumulate returns by reinvesting over a longer period, as well as take profits in shorter period.

29. The trading and risk management strategies, for the CTA, were borne from substantial investment of time and significant investment, cost, time  and development by Kumaran. They were designed and built over decades by Kumaran, and substantial time, money, research, development and highly-specialized skills, that are not easy to find, and to generate the options trades to give Plaintiff  a commercial competitive analytical advantage.

30. At all times Kumaran has protected this information under strict Non-Disclosure Agreements, non-compete and non-reverse engineering provisions, requiring the signing of express confidentiality agreements, and protecting its use and dissemination, and further took steps to rarely disclose the information. Plaintiffs do not disclose the trade secrets, except under the express rubric of its own restrictive non-disclosure agreement. Further Plaintiffs restrict access to all its Confidential Information on its servers, including but not limited to password access, restrictive access to drives.

31. At no time, either prior to, during or subsequent to the events hereunder did Kumaran assign ownership, right, title or interest to the IP to any person, corporation or legal entity. Kumaran in her individual capacity remains the sole owner in all IP interests.

32. In order to form the businesses, Kumaran, individually and friends and family as partners agreed to assist with financial capital and labor sweat equity estimated of significant amounts of capital to help form the business. Kumaran, in her individual capacity, also invested IP, as a capital contribution, which was valued separately and significant in long term business value, the partners agreed would have significant initial capital contribution value.

## ADMIS BACKGROUND

33. ADMIS is a wholly owned subsidiary of Archer Daniel Midlands Company. ("ADM") and upon belief commenced business discussions with Vision's owners in or around June 2014.

34. On or around June 20 2014, 2010, Vision Financial Markets, LLC registration as a Futures Clearing Merchant with the National Futures Association was deemed effectively barred. On this date, NFA issued a public announcement that Vision effectively barred from Membership  and stated that acknowledge a pattern of serious disciplinary actions by regulators and that Vision has had a long history of supervisory issues during its tenure as an NFA Member. It has been the subject of four prior NFA Complaints -three of which charged the firm with failing to diligently supervise various aspects of the firm's operations. [2]

35.  Vision Financial Market's profiles on NFA Basic Website shows the entity was subject to 172 CFTC Reparations against it as Defendant - cases brought against Vision, its management and owners by harmed customers – a firm with a serious disciplinary track record of violations, that customers, including Plaintiffs would not choose to do business.

36. In or around 2010 Vision was fined $500,000, specifically list Vision's risk management failures in options risk management on futures and caused losses to customer of millions of dollars. The risk manager of Vision at the time was John Felag, and under the supervision of Howard Rothman and Robert Boshnack.

37. Three years later, however, in or around 2013, Vision's gross negligence and failures in risk management specifically in commodities futures options trading, caused customers to lose another

---

[2] https://www.nfa.futures.org/news/newsRel.asp?ArticleID=4428

$2.1 million. Vision Financial Markets was fined $1,500,000 and paid approximately $2 million in customer restitution. Complaints filed cited Vision's failure to observe high standards of commercial honor, failure to observe just and equitable principles of trade, failure to maintain adequate records, and failure to supervise.

38. However despite public statements that Vision would exit the business it did not. By piercing the corporate veil, its owners Howard Rothman and Robert Boshnack, in their individual capacity, tailored a deal, in or around September 2014, by which they would simply change the name of Vision, form numerous other affiliates, including but not limited to High Ridge Futures, High Ridge Holding Company, LLC Vision Investment Advisors, and partner up with ADMIS.  Same company, new names.

39.  Vision Financial Markets, LLC is still in existence and operation, continues to be subject to other fines and grievances of misconduct from the SEC and CFTC  and is owned by Howard Rothman and Robert Boshnack. [3], [4]

40. Concealed from the public, in what appeared to be a straight transfer of business to ADMIS, was that behind the scenes, Boshnack and Rothman, in their individual capacity, agreed to essentially buy their way back into the business, and provide substantial personal financial incentives and  undisclosed personal guarantees on its network of Vision IB's -  Introducing Brokers that were previously clearing through Vision. ("Vision IB's).

41. The catch - in exchange for millions of dollars of financial incentives from Boshnack and Rothman to ADMIS – ADMIS would secretively distribute its customers and CTA's confidential and proprietary financial accounts, behind the scenes, (without the customers and CTA"s knowledge, consent or authorization) to Vision and its owners, employees and affiliates, to access their trading strategies.

---

[3] https://www.goodetrades.com/2019/04/sec-fines-clearing-firm-vision-financial-markets-llc-625000-for-failures-to-file-sars-about-penny-stock-deposits/
[4] https://www.cftc.gov/PressRoom/PressReleases/7973-19

42. The second catch -  ADMIS would pass through unauthorized fees to the victims, to fund Vision's owners, employees and affiliates upon belief, estimated to exceed ten  million dollars a year, to customers which it would materially and fraudulently conceal in the account opening.

43. The third catch -  after ADMIS disseminated all its CTA's competitive algorithms to Howard Rothman and Felag, Vision set up another affiliate called Vision Investment Advisors, Inc to directly trade in competition with all the CTA's who financial accounts it had unlawfully gained access to – while ADMIS, in direct unfair market competition, continued to give Vision, preferential rates, discounted commissions, and sell-out its competitors trade secrets.

44. This conduct directly violates the intent of the Commodities Exchange Act, thwarts fair market competitions and has harmed dozens of customers and CTA's, not just by the unlawful overcharges estimated to be over $50 million dollars, but the attrition and theft of intellectual property, trading strategies and destruction of new CTA's entering the business, who's account have been pillaged and distributed to be offered to Vision to gain an unfair competitive advantage..

45. The fraud is perpetuated by a ring of about 80-100 former Vision Introducing Brokers that were transferred over to ADMIS from the former Vision Financial Markets, LLC, in or around September 2014, collectively called Vision IB's, that are located over the United States. Incorporated by reference Exhibit 3, is a list of some of the Vision IB's upon information and belief participating in the fraud.

46. The Vision IB's with the full participation and knowledge of ADMIS, use interstate wire and telephonic communications to solicit customers to open futures trading accounts at ADMIS who by omission and fraudulent concealment then distribute them to Vision. The scheme is perpetuated with scienter to deceive. Vision IB's together with ADMIS and Vision conspire on the overcharges to be passed through to customers – ultimately to generate revenues for Vision and the Defendant.

47. Upon information and belief, the overcharges range from 0.30cents to $6 a trade which are willfully added only *after* the account is open, in violation of NFA 2-26, and disguised as trade processing fees and transaction fees. This timeline makes it harder for customers to dispute the charges, and close the account. It also violates the CEA. As part of the fraudulent sales and

solicitation, ADMIS at all times materially omits and conceals and/or misrepresents that those fees are being wired across interstate lines, with cash deductions from customer accounts to pay Vision

48. Further, the scheme is designed to deceive and "be careful" CTA's don't find out – as the conduct violates Federal law. Vision, ADMIS and Vision IB's and Defendants willfully conspired to reduce the overcharges to CTA's to $0.30 cents a trade, as CTA's are more price sensitive and more likely to detect the fraud if they notice higher over charges. In return Vision improperly acquire and gain unauthorized computer access, across interstate to their competitors CTA trading account. For innocent customers, also victims of the scheme, overcharges can be as high as  $6 a trade, which are being disgorged from their account, to fund Vision's new businesses.

49. Defendant and its conspirators meanwhile have been unjustly enriched, and the market place fraud continues to date with hundreds of customers and CTA's still unaware that ADMIS has distributed their confidential futures trading accounts to Vision.

## FRAUDULENT INDUCEMENT OF CONTRACT

50.    ADMIS and its network of Vision IB's used fraudulent sales and telephonic solicitation to induce customers, including Kumaran to open accounts at ADMIS. During the account solicitation process, Kumaran inquired through ADMIS' IB of all risk management policies and procedures as is required under NFA 2-26 / CFTC 1.155(k). (l). An initial list of those IB"s is incorporated by reference in Exhibit 3.

51.    To induce Plaintiffs to continue disclosing trading secrets, and providing business to the ADMIS, Defendant and its agents, servants, employees and introducing brokers, have gone to great lengths to systematically conceal their fraud.

52.    By way of example and not limitation its Vision IB's, including but not limited to Trey Lazzara and ADMIS during the period December 2016 until around January 2017 engaged in a series of fraudulent solicitations and sales, using interstate wires and communications from his offices in Austin, TX to Plaintiffs offices in New York City to fraudulently solicit Plaintiff to open commodities futures trading accounts at ADMIS. Incorporated by reference in Exhibit 1

documents the fraudulent sales and solicitations with detailed of dates of fraud and communication using interstate wires and mails.

53.    ADMIS also were under material disclosure requirements as an FCM, including but not limited to those under NFA 2-29, NFA 2-26 and NFA 2-2 which require that ADMIS were obligated to disclose to customers prior to opening the account without limitation, all costs and fees included with the transaction, their proprietary margin systems, risk management procedures and were expressly prohibited from engaging in conduct that would be fraudulent and deceiving.

54.    At no time during the account solicitations process did ADMIS contact or communicate directly with Kumaran or NRCM. In fact when Kumaran tried to communicate directly, it was advised that Lazzara and LCI were responsible to handle to the communications. (See Exhibit 1)

55.    ADMIS however at all times, knew, were aware of and/or directed the sales and solicitations, were responsible jointly and severally, for the conduct of sales and solicitations of its introducing brokers, and in any event had their own independent obligations under the CEA as an FCM to communicate truthful representations in the sales and solicitations of its account openings. ADMIS were directly involved in the scheme with the introducing brokers to fraudulently conceal Vision's unauthorized activity and illegal access to customers and CTA's accounts as alleged herein. Therefore by omission and knowing concealment partook in the fraud and deception.

56.    Because of Kumaran's direct professional background in risk management, she specifically asked and sought direct information on the risk handling, margin policies, and the exchange rules or other proprietary margin systems that would be used on its options trading account, and the risk management policies and procedures. ADMIS fraudulently concealed and omitted to disclose.

57.    On all dates between December 2016 and January 2017, included by reference in Exhibit 1, ADMIS, in conspiracy with Lazzara and LCI, with intention to deceive, during the sales and solicitations even though Kumaran and NRCM were requesting specific information about the risk management policies and procedures, fraudulently concealed and materially omitted to disclose and material information about its risk program including but not limited to :

a.    that it had material risk management policies and procedures that required Kumaran's account be handled and fully disclosed to Vision affiliates, owners and employees, in violation of CFTC 1.11, NFA 2-26, NFA 2-29, NFA 2-2;

b.    that it had materially outsourced the handling of margin calls and risk management duties to Vision affiliates, owners and employees which included delegation of authority to liquidate its account, extend credit on the account and place trades on the account without customers knowledge, consent or permission in violation of CFTC 1.11, 7U.S.C.§ 2 (c)(v)(IV)[5]

c.    that unauthorized fees, would be added after account opening, concealed prior to the account being open. These fees are being charged in express violation of the CEA, CFTC 33.7 and NFA Rule 2-26.

d.    that all the CTA trading strategies, confidential and proprietary information would be disclosed to its competitors and other NFA Member, without customers and CTA's knowledge, consent and permission in violation of NFA 2-4 9061 and DTSA;

e.    that the owners of Vision, Howard Rothman, Robert Boshnack and Vision affiliates had extended material personal financial guarantees on Plaintiff's accounts, which were material considerations to which Plaintiffs would have made a decision to not open an account, and chosen to do business elsewhere in violation of NFA 2-26/CFTC 1.55;

58. The concealment of these authorizations on Plaintiffs' accounts were material. Plaintiffs reasonably relied to its detriment on the misrepresentations made by and on behalf of the Defendants, and have been harmed accordingly.

59. ADMIS and its conspirators knew that, if Plaintiffs, knew of the foregoing concealments, omissions and other misrepresentations and Vision it would chose not to business with ADMIS, so they intentionally concealed, with intention to deceive.

60. Each of the defendants in the named conspiracy, herein conspired with one another to accomplish and to further the objectives of their fraudulent scheme.

---

[5] 15 U.S. Code § 78g (2)(A),§ 78g (2)(B),  NFA 2-26  17 CFR§1.57 (c.),  NFA  2-26 / 17 CFR § 1.55 Part (k);

61. All of the acts and omissions of the defendants described throughout this Complaint were undertaken intentionally.  The fraudulent scheme perpetrated by the defendants was designed to, and in fact did, result in the Plaintiffs opening accounts, transferring assets, funds, property and making payments  and collecting fees to the benefit of and on behalf of the defendants.

62. Plaintiffs had a right, as expressly provided under the CEA, and the laws and Federal statutes to disclosure of the foregoing information prior to account opening, and accurate, honest and facts about the handling of its account. The anti-fraud provisions of the CEA, specifically prohibit fraudulent and deceptive conduct, and the account were fraudulently induced accordingly.

## ILLEGAL PRIVACY POLICY

63. The fraud is perpetuated around ADMIS, Vision its owners employees and affiliates, Vision IB's and Lazzara, using fraudulent sales and marketing solicitations to solicit new customers and CTA's, usually newcomers to the industry by a deceptive and deceptive, illegal and void-under-law, ADMIS Privacy Policy and an illegal and void-under-law ADMIS Customer Agreement.

64. One of the linchpins of the fraud, is a deceptive ADMIS Privacy Policy which is unenforceable and contains unlawful provisions, that do not comply with the CEA and other rules, regulations and  Federal Law.

65. Specifically the ADMIS Privacy Policy gives customers fraudulent assurances that ADMIS will maintain the confidentiality and protect the financial data of the trading accounts, other reassurances and laid out explicit protections for

> *The "Companies" take very seriously their responsibilities to keep your personal information private. The "Companies" will not disclose non-public personal information about our customers except as required and permitted by law and except under the circumstances described above; and that The "Companies" will not disclose any of your personal information to unaffiliated third parties, unless specifically authorized by you in writing to do so. The confidentiality and conditions of this agreement will continue to be maintained even when you cease to do business with the "Companies"...*

66. The Privacy Policy further defined clearly that the transactions and trading history made by Customer were included in the definition of non-public personal information.

> *"Companies" also obtain and retain non-public (personal) information about you resulting from <u>transactions involving your financial investments</u>. This includes your account balances, funding and <u>transaction history</u>.*

67. The Privacy Policy has therefore materially ambiguous terms, is intended to deceive, as the provision are overtly construed in favor of the Customer to ensure the privacy of customers' confidential financial data, that requires their consent to disclose. These consents to disclosures are also codified in Federal privacy laws, the CEA and other disclosure obligations therein.

68. In order to intentionally and fraudulently circumvent the CEA, ADMIS and Vision conspired to fraudulently mispresent and mislabel Vision, its owners, employees and affiliates as risk management service providers. Under this false pretense, ADMIS knowingly concealed and conspired to deceive, and fraudulently concealed, the fake service provider agreement, to grant unauthorized access to hundreds of its customers accounts in violation of the exchange laws.

69. Upon information and belief, no such codified risk service provider agreement exists, only a sales and marketing agreement which specifically and inherently requires that ADMIS and Vision abide by the laws and regulations of the CEA. Therefore the title was intentionally fraudulent.

70. *Second – illegal-* any service provider agreement, has to be legal, and inherent in any contract, is the express requirement that it comply with all applicable rules, regulations, requirements of the Commodities Exchange Act, and all applicate Federal laws. For example, hiring Bernie Madoff as a service provider, doesn't legitimize the services, if the services themselves are unlawful. The illegality of the provisions and umpteen violations of rules and requirements render these services provider arrangement void under law and the Privacy Policy illegal. Further as alleged herein the services were unnecessary and were replete with errors and omissions.

71. *Third* the unnecessary and unlawful risk management service provider agreement has to comply with the rules of the exchange and CEA. Without limitation, risk management services have to comply with CFTC 1.11 and be disclosed on the Risk Management Program to the CFTC and in accordance with those regulations. CFTC 1.11(d) specifically requires that risk management services are provided by qualified personnel**.** Also this conduct had to be disclosed in accordance

with the rules and laws[6]. Upon information and belief, no such disclosure to the CFTC was made and the services were performed by unqualified personnel who had caused over $2.1 million dollars of losses in failed risk management and oversight and in 2014 were effectively disbarred

72. *Fourth* the unnecessary, unlawful, not approved risk services, were done with gross negligence and replete with errors, in accordance with the compliance laws, of the CEA and other rules, and regulations, must be disclosed prior to customers and CTA's opening the account. Incorporated by reference the errors in Exhibit 2, shows the unnecessary and unqualified services were replete with errors and omission. [7] This also constitute unfair competition, in depletion of CTA's performance.

73. *Fifth*, the services were unlawful and violated margin laws. Without limitation, CFTC regulations specifically require disclosure of the margining system under NFA 2-26/CFTC 33.7. Vision's owners, employees and affiliates were using a non-compliant, unorthodox system of *margin allowances* violating CME rules 930, 980, 982 and CFTC 1.11 caused direct unfair market competition. The conduct alleged permitted Vision to unlawfully deplete their competitors CTA's performance in excess of 12% annually.

74. *Sixth*- the services were material and had to be disclosed as a matter of law. Any disclosure, by omission or otherwise that is likely to deceive, defraud or otherwise mislead  customers, are expressly prohibited under the CEA, anti-fraud provisions.  Any false representation of a material fact made with the knowledge of its falsity and intent that it shall be acted upon, and which is acted upon to the injury of the other contracting party, constitutes such fraud. Therefore the Privacy Policy and ADMIS Customer agreement, contained false representations, made material factual omissions, and fraudulently induced the contract which renders the contract voidable at the election of the injured party.

75. *Seventh,* in consideration of Vision's disbarring, the disclosures were material. Given Vision's long disciplinary conduct, its effective expulsion from the industry, its record of 172 CFTC

---

[6] NFA Rule 2-26  and CFTC Regulations 1.11, 1.33, 1.55, 1.56, 1.57, 1.65, 155.3, or 155.4,   NFA Compliance Rule 2-26 / CFTC Regulations 1.55 Part (l) 6[1] / CFTC Regulations 1.55 Part (i) 6[2] CFTC Regulations 1.55 Part (k) (11) 6[3]  7 U.S.C.§ 6b, Commodities Exchange Act 4b 6[4]  Section 4d(a)(2) of the Commodity Exchange Act6[5
[7] 7 U.S.Code § 2  (c) (v) .(IV)  15 U.S. Code § 78g -(2)(A) , 15 U.S. Code § 78g (2) (B) ,  NFA 2-26  17 CFR § 1.57 (c.)   NFA Rule 2-26 / 17 CFR § 1.55 (k) .CFTC 1.11

reparations cases, $2.1 million dollars of customer losses under its supervision, and $1.5 million dollar fines for inequitable commercial conduct, its directly competing businesses, both as a CTA, and also running a CTA referral business, with clear, unequivocal conflicts of interest, disclosure was material and mandatory. These were blemished actors, with a serious disciplinary track record.

76. To be material, the representation need not have been the paramount or decisive inducement, so long as it was a substantial factor. A misrepresentation induces a party's manifestation of assent if it substantially contributes to his decision to manifest his assent. Customer's and CTA"s had the right to know, that owners and employees of Vision, effectively disbarred, with directly competing interests, a substantial disciplinary track record, 172 CFTC reparations, and conflicts of interest, not just had access to their accounts, but had discretionary authority to liquidate their accounts, place trades on their accounts, extend credit and margin on their accounts, and other discretionary authority, which expressly required their consent and authorization. The unlawful services, sought to circumvent the material rights for customer consent, opt-out, grant permission and were therefore prohibited.

77. *Eighth* – the material disclosure requirements were not only required under Federal law but were mandatory requirements for participation under the CEA. Those material disclosure requirements are expressly codified in CFTC 1.55 including but not limited to 1.55(k) (l) and (i) where ADMIS and Lazzara had mandatory obligations to disclose their current risk policies, procedures and margin activities, expanding on anything so as to ensure it is not misleading.

78. *Ninth* –the services had to comply with Federal laws, Privacy laws, including opt-out criteria, as well as anti-trust, and deceptive business practices, as well as the Defend Trade Secrets Act, that  prohibit distribution confidential financial accounts and customer trades secrets, to its competitors and unauthorized third parties under 18 USC 1831 preempt any such agreement,

making it unlawful. Federal privacy laws, also required customer to have an opt-out and all the following privacy laws were violated. ADMIS had to give the customers the right to opt-out.[8]

79. *Tenth* -If the risk management services were legal, why all the deceit, fraud, misrepresentations and dishonest conduct and overt attempts to conceal? The persistent false representation made and material misstatements of fact, are documented over a continuous pattern of fraud and deceit are impermissible. Lazzara, LCI, Villa and ADMIS and conspirators went well out of their way to make fraudulent representations in violation of CEA, CFTC and NFA.[9] (See Exhibit 1 and 4)

80. As evidenced Plaintiffs on numerous dates, specifically questioned the risk management procedures, errors and omissions, and mishandling of margin on it account, that ADMIS is obligated to disclose under CFTC rules. ADMIS persisted and repeatedly concealed, disguised and made fraudulent representations of fact, among other things, that upon belief, Robert Boshnack had unlawfully violated margin laws on credit of over $134,000 on Plaintiff's $25,000 which were material financial concealments and violation of rules in margin[10]. These activities are material financial facts, that Plaintiffs and other similar situated customers and CTA's have a right to know.

81. *Eleventh* –the express delegation of authorities are in direct contradiction of the representation in the ADMIS Customer Agreement. Customers were deceived that risk management would be in its "sole discretion" in Para 1(e), Para 4, Para 5, Para 7, Para 9 and Para 26. The fraudulent and deceptive and conflicting documents, did not permit ADMIS to delegate liquidation, margin handling and other discretion for risk services and granted no authority to delegate discretion to third parties. ADMIS outsourced discretionary authority to employees of the disbarred Vision and misrepresentation to customers that ADMIS were handling the risks in "sole discretion" was fraudulent representations. Plaintiffs never agreed to a service provider that had discretionary authority on its account, violating the ADMIS agreement and rendering the services impermissible.

---

[8] 7 U.S. Code § 7b–2 8[1], 15 USC § 6801 Title (V)8[2] , 15 US Code § 68028[3] , 17 CFR § 160.18[4], 17 CFR § 160.10 (a)(1) 8[5] 17 CFR § 160.10 (a) (2) Opt out 8[6] 17 CFR § 160.10 (b)8[7] 15 U.S.C § 6803 8[8] 15 U.S. Code § 6803 (c) 8[9] 17 CFR § 160.30 8[10] , 17 CFR § 160.4 8[11] § 160.4 (2) 8[12] § 160.4 (2)8[13] § 160.4 (f) 8[14]
[9] NFA Rule 2-25.9[1] NFA Rule 2-25 / CFTC Part 32 Reg, 17 CFR 32.2 9[2]– NFA Rule 2-25 / CFTC Part 32 9[3] NFA Rule 2-2 The Commodities Exchange Act Section 4b, 7 U.S. Code § 6b (2) 9[5]
[10] 7 U.S.C. § 2 (c) (v) .(IV), 15 U.S.C. § 78g -(2)(A)/(2) (B) , NFA 2-26 / 17 CFR § 1.57 (c.) § 1.55 (k), CFTC 1.11

82. The unlawful services posed significant threats, hazards, systemic risks to the market, direct unfair competition and as laid out herein the purported services, were unnecessary and this misrepresentation was material in the decision to entrust funds to ADMIS as an FCM.

83. *Twelfth* - the compensation for such illegitimate services was against the CFTC rules to deduct money from a customer's account to pay Vision without authorization, consent and notification prior to opening the account. If ADMIS wanted to hire a legitimate service provider, such as a webdesigner,  ADMIS was obligated to pay for it. However the fraudulent conduct, violated financial charges under the CEA and required Customers knowledge consent and authorization.[11] Vision were deducting cash directly from customer accounts across interstate lines and its financial fraud, estimated to be over $50 million dollars. Plaintiffs paying for unlawful service providers was in violation of the law.

84. In conclusion, the rogue risk management services purportedly provided by the Vision defendants were not necessary, were unlawful, were fraudulently concealed, were performed by unqualified personnel on material deficient platforms, violated the Commodities Exchange Act and other laws, were grossly negligent, were replete with errors and omissions, were not authorized by or disclosed to the customer as required under the CEA, and were fraudulently paid for.

85. Therefore the Privacy Policy was unlawful, void-under-law and does not permit such activity.

## HOW PLAINTIFF SUCCUMB TO THE FRAUD

86. During the period around December 2016 until January 2017, using interstate and wire communications to Kumaran in her offices in New York City, Trey Lazzara, at Lazzara Consulting, Inc located in Austin Texas, one of the Vision IB's involved in the scheme, and an unregistered Associated Person, Julie Villa,  used fraudulent sales and promotional telemarketing pitches, to introduce and solicit the sales to ADMIS in violation of the NFA 2-29, NFA 2-26.  Villa also materially concealed her past with the futures industry, by using a duplicate LinkedIn profiles and also omitted her role at Lazzara. Exhibit 1, incorporated herein documents this timeline.

---

[11] NFA Rule 2-26 / CFTC Regulation 33.7 (b) (2) 11[1]    CFTC Regulation 33.7 (b) (4) 11[2] CFTC Regulation 33.7(c) 11[3] CFTC Reg 33.7 (f) 11[4] NFA Rule 2-4  Not 9005 11[5]  7 U.S.C.§ 6b, Commodities Exchange Act 4b

87. On dates including December 18, 2016, January 18, 2017, January 22, 2017  January 30, 2017 Lazzara and Villa fraudulently concealed and materially omitted, while maintaining active communications with Visions team, that by virtue of opening an account at ADMIS, Kumaran's account would immediately be disseminated to Vision in Stamford CT who were inherently interested in acquitting Kumaran's risk management and options trading strategies.

88. Lazzara and Villa repeatedly made overt fraudulent representations using interstate and wire communications to induce Kumaran to open the account at ADMIS,  including artificially lowering commission, on January 30 2017, blatantly lying about the risk management program, policies and procedures, in violation NFA 2-26 / CFTC 1.11, CFTC 1.55 and CFTC 33.7.

89. Once Kumaran had opened the account, the account was secretly, immediately turned over to Vision to unlawfully scrutinize the trading strategies on or around January 31, 2017.

90. In a repeated and persistent pattern of fraud and deceit, as incorporated by reference in Exhibit 4,  on dates including January 31, 2017 February 1, 2017, March 8, 2017, March 21, 2017, March 23, 2017, and April 10, 2017, with the direct knowledge, conspiracy and instruction of ADMIS, Trey Lazzara, using interstate and wire communications from his offices in Austin Texas, to Kumaran in her offices in New York City, to conceal the activity by omission and deception used acronyms such as "risk guy", "dev team", "tech team" to disguise Vision's involvement, cutting and pasting emails so as to pretend they originated from ADMIS; masking domain names; making numerous oral and written misrepresentations; deliberately pretending that "*John from risk*" works at ADM; when in fact it was John Felag; materially in some communications deliberately misrepresenting  Vision as "ADM risk" and "ADM" and/or a "division of ADM".

91. The CEA prohibits such fraud and deception. Lazzara at all times, acting together and with knowledge of ADMIS, materially omitted and fraudulently concealed Vision's access.

92. A complete timeline of the dates with peculiarity of the fraudulent conduct is incorporated herein by reference in  Exhibit 4.

93. In all instances, Kumaran had requested the information directly from ADMIS, and also requested to speak directly to ADMIS. As stated supra, ADMIS employees notified Kumaran that all communications should be solely though the IB.

94. ADMIS as the FCM was under its own independent set of duties and obligations to convey honest and accurate information related to its customers accounts, including but not limited to those under NFA 2-2, NFA 2-4. NFA 2-26 and NFA 2-29 and other rules under CEA.

95. In bad faith, despite the many requests for information on the risk procedures, ADMIS, knowingly and intentionally continued with the fraudulently concealment, and omissions and even though there were multiple documented errors and omissions, and screenshots of gross negligence and violations of margin, did not respond, and propagated the fraud and deception.

96. Kumaran, during the period January 30 2017 until around June 20, 2017 documented numerous errors and omissions, and gross negligence in the risk management procedures, that violated CME margin rules. Incorporate by reference those errors are contained in Exhibit 2.

97. Those exhibits using interstate wires and telephonic communications, were emailed to Lazzara, and according to his representations, on dates in Exh 2. either by email or on the phone were sent to ADM or he "*spoke to ADMIS*" about the errors who were aware of the problems.

98. Despite Kumaran's repeated questions about the risk management policies at ADM and documented evidence of screenshots replete with errors and omissions, violating exchange rules, and scores of risk management errors that violated among other things CFTC 1.11, CME 980 and CME 982, ADMIS directly persisted in the fraud, at all times concealing it was Vision's grossly negligent and unqualified risk team, who were behind the scenes impersonating the risk management program.  The errors were upwards of 200% of  account value, violating the CEA.

99. The errors and omissions in Exhibit 2, show a preponderance of evidence that ADMIS deficiencies and errors were so extremely careless that it was equivalent to recklessness, and demonstrated complete wanton incompetence and recklessness far distinguished from the failure to exercise ordinary care.

100.    ADMIS, with it conspirators, as documented with dates and ties of material fraudulent representation in Exhibit 1, went further to repeatedly convey misinformation and misrepresentations to Kumaran about the gross negligent errors. misrepresenting that "a patch would fix the system" and the "portal was being fixed" amongst other documented excuses, without disclosing the material information, that there was no fix and risk had been outsourced.

101.    ADMIS knew of the falsehoods, had a duty to be honest, and directly participated in the scheme of concealment, hiding behind Lazzara as a front piece, but at all times knew, fraudulently concealed and omitted risk and handling of margin had been outsourced to Vision.

102.    Kumaran relied on the representations, that the problems were temporary, even switching its trading to WTI Crude Oil from Heating Oil, where ADMIS had also fraudulently concealed technological deficiencies.

103.    On or around April 20, 2017 Kumaran's CTA account was proving out and showing higher than average returns in its options trading strategies, at over 12% over sixty days.

104.    On or around May 2, 2017 – competitors and strangers - Boshnack, Felag and other employees and affiliates of Vision who had been granted unauthorized computer access into their competitors Kumaran's CTAs trading account, in violation of NFA Rules,  willfully and intentionally tampered with financial controls, added on further unauthorized fees, and tortiously interfered with and sabotage their competitors, Kumaran's CTA's trading performance, in express violation of the CEA, and direct espionage.

105.    At no time did Kumaran, or NRCM grant consent, or authorization for these activities, or Vision's employees, owners or affiliates

106.    Further, on or around May 2, 2017 Vision and its affiliates, to deliberate thwart competition of Kumaran CTA's account, began withdrawing and scalping additional cash deductions from Kumaran's CTA performance records (after wrongfully acquiring inside access to the account from ADMIS),

107.    In further malfeasance, wrongdoing, without Kumaran's knowledge and consent, Boshnack and Rothman, were tampering with, interfering with, violating exchange rules, and in

gross negligence and errors and omissions, misstating margin by over $134,000 on a $25,000 account and using unreasonable, non-exchange complaint procedure to inflate Kumaran's account – with detrimental effects. Lazzara and ADMIS never issued a margin call violating the CEA.[12]

108.    At all times, including on May 15, 2017 and May 16, 2017, using interstate wires and mail communications, Lazzara and in conspiracy with ADMIS, persisted in the fraud, deceit and misrepresentation, to conceal Vision affiliates access and their grossly negligent, deliberate and material meddling in its competitor CTA's account, which was expressly forbidden under exchange rules, and instead fraudulently misrepresented that ADMIS had authorized an intraday credit line. The information was false

109.    Upon belief, Boshnack, Rothman, Felag and Vision employees, owners and affiliates, who were direct competitors, had unlawfully manipulated credit without consent or authorization, causing material harm and sabotage to a competitor Kumaran's CTA account.

110.    On or around May 17, 2017  and again on or around June 16, 2017 Kumaran in New York City, NY spoke to Dave Glancy in Chicago, IL, at ADMIS risk department using interstate wire and telephonic communications. Glancy, also, by fraudulent concealment, intentionally omitted and failed to disclose that Vision affiliates had been outsourced risk and margin handling.

111.    On or around June 25 2019 Kumaran closed the account at ADMIS, citing gross negligence in the risk department and still materially unaware of Vision affiliates access to the account.

112.    On or around August 20 2017 Kumaran through reconciliation and audit, detected that cash balances in the account ending balances did not tie out, and that unauthorized fees and payments had been made to deplete its CTA performance by over  3.4% over forty five days, to deplete its competitive valuation in direct and targeted unfair market competition.

113.    On or around September 20, 2017 Kumaran uncovered that unauthorized access had been given to its account to third parties, Vision's owners and affiliates and started to confront Lazzara.

---

114.    On or around September 20, 2017, September 27, 2017 and September 29, 2017 after multiple emails, seeking explanations from her broker Lazzara, how unauthorized third parties Vision affiliates had access its accounts, and demanding to know what their financial interest was in her proprietary trading records as a CTA, Kumaran was alerted to the fraud. (**See Exhibit 5**)

115.    Lazzara on or around September 27, 2017 tried to blame others " he was following risk management procedures of ADMIS to give confidential emails related to Kumaran's trading account to Vision's affiliates' risk management procedures he had materially concealed at account opening, and were mandatory to be disclosed under NFA Rule 2-26 / CFTC 1.11, 1.55 and 33.7.

116.    On or around October 12, 2018 ADMIS,  admitted that it had shared the trading strategies of Kumaran's CTA account with its competitors Vision, its owners, employees and affiliates – in arrangement for them to provide risk management services. The risk management services performed were grossly negligence, by unqualified personnel, replete with errors and omissions, and egregious violations of the CME rules, to use non-compliant exchange rules.

117.    It was apparent that Kumaran's was one of many customers and CTA's that ADMIS had been giving backdoor access to Vision, to unlawfully acquire the trading strategies and financial information of its confidential futures customers' accounts. Kumaran, a registered CTA and NFA Member had not authorized such conduct, and it was fraudulently concealed.

### UNLAWFUL ACTIVITY, ILLEGAL AND VOID

118. Plaintiffs at all times complied with the terms of the Customer agreement, and had no knowledge of the activities of Vision.

119. Instead ADMIS materially beached the Customer Agreement, including but not limited to Section 11, which states that ADMIS shall be subject to the applicable constitution, rules, regulations, customs, usages, rulings, and interpretations of the CEA, CFTC, NFA and other exchange rules. ADMIS illegal activities with Vision, to defraud customers and CTA's therefore breached of an express condition of the ADMIS Customer Agreement, under Section 11.

120. Further inherent in all agreements, is the requirement that ADMIS comply with the law. Unlawful conduct renders the contract illegal and unenforceable and void-under-law.

121. As alleged in the facts in this Complaint and also incorporated by reference in Exhibits 1, 2 and 4, ADMIS materially breached the Customer Agreement and violated multiple laws, regulations, Privacy Laws, Federal laws, and materially breached its compliance obligations under Section 11. ADMIS failed to comply with the Commodities Exchange Act, and NFA and CFTC Compliance Laws including but not limited to;

   a. NFA 2-26 including without limitation CFTC 1.11, CFTC 1.55 and CFTC 1.57 which required Lazzara and ADMIS, disclose customers, *all* its risk management policies and procedures, *prior* to opening the account;

   b. NFA 2-4 Int Not 9061 which states it is a NFA Compliance violation for NFA Members Felag and Vision owners, affiliates to obtain a CTA's trading records without their permission;

   c. NFA 2-4 Int Not 9005 and NFA Rule 2-26 / CFTC Part 33.(7) which required that Lazzara disclose all the costs and transaction fees and trade processing fees (being deducted from Kumaran's CTA record to pay Vision) prior to the account being open, and that any arrangement that is likely to deceive customers is a violation of NFA Requirement;

   d. NFA 2-2 which makes it an NFA Compliance Rule violation to in any manner deceive, cheat or defraud another NFA member or commodities futures customer;

   e. NFA Margin Handbook and NFA Financial Handbook Section 7, which mandated that Lazzara and ADMIS, issue margin calls directly to Kumaran, and not to Robert Boshnack, an arrangement which to a material failure to enforce exchange compliance laws in Performance Bond margin and failure to issue margin calls under CME 980, CME 982.

   f. NFA 2-26 17 CFR 1.57 and 7 USC 2 (c.)(v)(IV), CFTC 1.11 and 7 U.S. C.§ 2 (c)(v) .(IV) 15 U.S. Code § 78g - (2) (A),(2) (B), NFA 2-26 17 CFR § 1.57 (c.), 17 CFR § 1.55 Part (k); and which prohibited strangers, Vision, its owners, affiliates and employees from directly or indirectly extending, or maintaining credit to or for, or collecting margin on Kumaran's

account. It also prohibited them from having discretion on Kumaran's account, as well as power of attorney to handle margin calls;

122.  Not only did ADMIS perpetuate violation of numerous NFA and  CFTC compliance rules the very rules they had a duty to comply with,  ADMIS failed to abide by multiple Federal laws, that protect the integrity of customers personal financial data, confidential information as well as their proprietary trading records and transaction history. For example for CTA's, professional traders, who were direct competitors of Vision Investment Advisors, LLC, Felag, Rothman, Boshnack, another CTA, Federal law prohibits the unauthorized dissemination of a CTA's trade secrets to their competitors, under 18 USC 1831 el seq, across interstate lines under the DTSA.

123.    ADMIS's conduct infringed the very heart of the Commodities Exchange Act, that the NFA 7U.S.C.1,§5 was enacted to promote "fair market competition" and to protect the interests of market participants, to promote responsible innovation and fair competition among market participants and diverted fair market competition to harm small businesses, entrepreneurs, minorities and sole props, to deplete their economic advantage and support a network of insiders.

124.    The unlawful conduct, illegalities constitutes material breaches of the ADMIS agreements, and recission in its entity.

## MATERIALLY DEFICIENT ELECTRONIC PLATFORMS

125.    Also fraudulently concealed from Plaintiffs at account opening was ADMIS' knowledge and information that it had materially deficient electronic platforms, involved in the illegal outsourcing to Vision. Further unknown to Kumaran at the time, ADMIS were fully aware of material deficiencies in its electronic platforms to compute intraday risk and valuation on commodities futures options.

126.    Months after the account was opened, and fraudulently concealed at account opening,  the introducing broker Lazzara admitted that risk management services were using "decades old eighties technologies with materially deficient which did not have capabilities to monitor options intraday" and "Kumaran should not use the portals and platforms till they were fixed".

127.   Despite representations during the account trading, they have not been and never were fixed. Upon information and belief, these material limitations have persisted in risk platforms for decades, that lacks the ability to perform real-time intraday calculations on commodities options.

128.   These resulted in material breaches of ADMIS Customer Agreement and were material disclosures that should have been disclosed prior to inducing customers to open accounts in derivatives trading. Among other things, it was later admitted that ADMIS were aware and yet fraudulently concealed its inability to handle derivatives trading (i)the risk department lacked the capability to confirmed with exchange rules and perform and intraday MTM, valuation and margin calculations in heating oil options (ii) the risk department had no capabilities to perform intraday valuation and margin requirements when Plaintiff(s) owned 100% of the open interest in heating oil options and (iii) the risk department were aware and concealing they were using technologically deficient platforms, apparently decades old,  that could not handle all the ladder of strikes in heating oil options. This conduct materially violates the CEA, violated CME 980. CME 982, CME 930 and other exchange compliance rules under CFTC 1.11 and CFTC 1.55, CFTC 33.7.

129.   Even when Plaintiff switched to WTI Derivative Crude Oils, the deficiencies persisted, and ADMIS continued fraudulent representations the systems were being fixed. The material deficiencies being concealed, later learned, impacted all commodities futures derivatives contracts.

### IB'S ADMITTED THE CONCEALMENT AND FRAUD

130.   Exhibit 2 incorporated by reference herein, documents the extreme magnitude of gross negligence and errors and omissions during the life of the account. At first, ADMIS made false representations that they were building "patches" and the systems would be fixed.

131.   By the time it was too late, and even after Plainitff  had switched the Crude Oil. Lazzara finally admitted that impossibility of performance at ADMIS, at all times fraudulently concealing that the risk services were outsourced to Vision.

132.   On or around April 24, 2017 Lazzara admitted systems and risk management services were a complete disaster, the company, ADMIS was "flying blind" and a "disaster waiting to happen" ,

acknowledging that even his own IB's portals and technologies were erroneous fluctuating by tens of thousands of dollars without any accuracy.  Lazzara admitted that ADMIS had known of the deficiencies and they were fraudulently concealed at account opening. Lazzara however in his communications fraudulently concealed the outsourcing to Vision affiliates.

133.  On or around May 5, 2017, Lazzara represented that the risk management department was so deficient, that ADMIS had no intraday margin requirements, and was incapable of monitoring intraday margin. ADMIS's own customer-facing IB's indicated that even the IB's own portals had errors fluctuating by tens of thousands of dollars a day and were replete with errors and omissions. Again Lazzara fraudulently concealed and omitted the outsourcing to Vision affiliates.

134.  On or around May 10, 2017 despite many requests from Plaintiff directed to ADMIS, on how the margin requirements were being calculated intraday on its account, ADMIS and Lazzara, persisted in making false representations, that ADMIS had no intraday margin requirements, and materially fraudulently concealed that margin and risk had been outsourced to Vision affiliates.

135.  ADMIS's conduct that as evidenced in Exhibit 4 and 2, and the fraudulent concealment of Visions handling of risk evinces a reckless disregard for the rights of others and smacks of intentional wrongdoing and were grossly negligent. The errors and omissions in Exhibit 2, show a preponderance of evidence that the risk departments deficiencies and errors was so extremely careless that it was equivalent to recklessness, and demonstrated complete wanton incompetence and recklessness far distinguished from the failure to exercise ordinary care.

136.  The grossly negligent risk services, material deficiencies, and errors and omissions were directly outward-facing for customers logging in to view their account balance, directly fed to the intraday margin available, incorrectly impacted transactional ability and were negligently represented on the customer and CTA' accounts, directly causing execution impairments, and significant violations of the CEA margin, and directly harmed customers and CTA's in their account management – and were material breaches of contract.

137.  The errors and omissions, and known material deficiency, and gross negligence, rendered impediments to performance that was not bargained for, at the time the contracts were entered into,

an impossibility of performance, and material breaches that go to the heart of the decision to entrust funds to an FCM. Plaintiff(s) would not have opened the accounts if ADMIS had disclosed these known deficiencies.

### MATERIALLY CONCEALMENT OF MARGIN POLICY

138.    ADMIS as an FCM, under the CEA, also had a material obligations to disclose the margin policies, any proprietary margin system being used by the FCM and the handling of margin[13].

139.    ADMIS and its introducing brokers, fraudulently represented that were using intraday margin consistent with CME Span and other exchange rules. As discussed herein, ADMIS had unlawfully delegated the handling of risks and margin to Vision, the calculations of margin were not consistent with margin exchange rules, notably CME 982, CME 980, CME 930, were grossly negligent and unqualified personnel, replete with material errors and omissions. (See Exhibit 2)

140.    Specifically in the unlawful outsourcing to Vision, they engaged in non-compliant activities of *margin allowances*. If such "*margin allowances"* were an alternative to margin requirements, there were no rules on how they were allocated or deployed and they were not consistent with the CME exchange rules.

141.    These "*margin allowances*" are arbitrary and inconsistent numbers, not compliant with CME Span calculations under the CME market rules.  Instead they are based on an ad-hoc and arbitrary number made up by Vision's unqualified risk management (without any basis in calculation) intended to cover up and conceal the magnitude of gross negligence, errors and omissions in Back-Middle-Front Office portals incapable of handling commodity derivatives.

142.    ADMIS materially failed to disclose and fraudulently concealed in violation of the CEA, outside of fair market participation rules, their margin policies permitting Vision to arbitrarily add and remove "*margin allowances*" to Customer accounts without any reasonable basis in violation of Rule CME 930, with errors to the magnitude in excess of 500% of Customer's Account Value. This is of significant harm to the Customer, and direct impedes fair market participation.

---

[13] See NFA Rule 2-26 / CFTC 1.55 Part (i) (k)) (l)) and CFTC 33.7 (b)(2)

143.    The gross negligence and errors and omissions showed ADMIS risk management policies of "*margin allowances*" were miscalculating the intraday margin on commodities derivatives reporting by multiples of account value, outside of SPAN, and in magnitudes either positive or negative, and in many instances certainly not equal to or greater than the SPAN performance. ADMIS is therefore not in compliance in CME Rule 930.A, and in breach of its Customer Agreement to comply with the regulations – sometimes at 500% of account value.

144.    This poses not just an unfair market place set up rules and participation on the adhoc and arbitrary *margin allowances* being added to Customer accounts, and also builds an inherent systemic risk in the intraday markets, in violation of the Commodity Exchange Act.

145.    The failure to disclose was material. Even before account opening, Kumaran had specifically requested information in accordance with CFTC 33.7. Plaintiffs relied on such information in its decision to entrust its funds with the FCM.

## IMPOSSIBILITY OF PERFORMANCE

146.  The risk management services at ADMIS were being handled by Vision led to an impossibility in performance. Not only were the violations a material breach of Section 11 of ADMIS Customer Agreement, the margin rule violation and errors rendered the contract void due to non-performance and non-compliance. As indicated herein after the account was opened, ADMIS materially and repeatedly conducted their obligations in violation of the law, the CEA, and other Federal laws and statutes. The contract was void not only by fraudulent inducement, but void under the doctrine of material impossibility.

147.  Plaintiff documented material errors and omissions, gross negligence and exchange rule violations including but were not limited to those in Exhibit 2, fell outside the reasonable care.

148.  The risk services were performed with gross negligence, material errors and omissions, and repeated violations of exchange margin rules, rendered performance impossible and materially and adversely sabotage customer account, and showed a wanton and reckless disregard for the rights of others.

## FALSE REPRESENTATIONS IN PUBLIC DOCUMENTS

149.    In opening the accounts at ADMIS, Kumaran relied not only on the fraudulent statements and sales practices of the introducing broker Lazzara, but also upon public disclosures made on ADMIS financial statements, websites, and the customer agreements and the rules and regulations of the Commodities Exchange Act and publicly available statements and disclosures that are available on websites and other publicly available literatures.

150.    Those ADMIS public statements, were false, misleading and among other things materially concealed (i) the rogue outsourcing of risk management to the owners and management team of the disbarred Vision, (ii) the materially deficient electronic platforms in commodities derivatives, (iii) the *margin allowances* that were being deployed by Vision outside of exchange rules and; (iv) the non-safeguarding of customers confidential account data in disseminating them to Vision .

151.    For example ADMIS false, intentionally misleading statement are contained in their annual financial disclosure statements on derivatives risk, in 2015-present date, and other ADMIS public Disclosure Documents Section 11-Summary of current risk practices, controls and procedures at ADMIS, publicly available on the ADMIS website which states

> "*The mission of the risk management program is to establish, maintain, and enforce a system of risk management policies and procedures designed to monitor and manage the risks associated with the activities of ADMIS as a Futures Commission Merchant. The program is guided by two overarching objectives: the safeguarding of customer property and the protection of the firm's capital*. "

152.    The public disclosures were materially fraudulent and false when made, as ADMIS knew they were intentionally deceiving its customer. The consumer and the general public has also been materially represented by both the introducing broker and futures commission merchant in its public Consolidated Financial Statements, that its derivatives margin was in "*compliance with various regulatory guidelines*".  As disclosed herein, the activities are not in compliance with regulatory guidelines, were known to be false and intended to deceive.

153.    ADMIS financial disclosures and ADMIS public Disclosure Documents Section 11-Summary of current risk practices, controls and procedures at ADMIS, publicly available on the ADMIS website which states  "*The various elements of the Risk Management Program are subject*

*to annual review by the ADM Corporate Audit department."* ADMIS and ADM have duties under Federal laws, including Sarbanes Oxley to disclose the true nature of their risk management operations. Any public misstatements are inconsistent with Federal laws and guidelines.[14]

154. Such public disclosures are false, since ADMIS were internally fully aware of the material deficiencies in capabilities of derivatives, the secret outsourcing to Vision, and were knowingly misleading and intentionally concealing material facts in the public disclosures of ADM and are a violation of Securities laws, to mislead customers, CTA's and shareholders.[15]

155. Since ADMIS were internally fully aware of the rogue undisclosed risk policies, material deficiencies in capabilities of derivatives, their public disclosures were false and deceptive.

156. Plaintiffs reasonably relied on the public disclosures of ADMIS, as it is owned by a publicly traded company. Therefore they are obligated to disclose financial facts not misleading, that a substantial portion of ADMIS' businesses in supported by credit lines from Vision's owners,

157. These are material concealments, omissions and fraudulent statements affecting the public at large, that customers and CTA's confidential trading records are being disseminated across interstate lines to the disbarred owners, employees and affiliates of Vision, an entity that was effectively disbarred and as such are over-charging unauthorized fees, to pay Vision, and the illegal outsourcing of risk management to the unqualified personnel of Vision is replete with errors and omissions, posing great risks and harm to customers. ADMIS unlawful conduct is also impeding fair market competition and causing irreparable damage to small firms, who have entrusted their CTA" strategies, and are being depleted of their competitive advantage.

## MAIL, WIRE AND TRADE SECRET FRAUD RACKETEERING ACTIVITY

158. As disclosed herein the rogue risk management services purportedly provided by the Vision Defendants were not necessary, were unlawful, were fraudulently concealed, were performed by unqualified personnel on material deficient platforms, violated the Commodities Exchange Act

---

[14] Sarbanes Oxley 302 and 404.

[15] *See* CFTC Rule 1.55, Sarbox 302, 404, NFA Compliance Rule 2-26, CME Rule 901, CME Rule 432, 7 U.S.C.§ 6b, Commodities Exchange Act 4(b)

and other laws, were grossly negligent, were replete with errors and omissions, were not authorized by or disclosed to the customer as required under the CEA, and were fraudulently paid for.

159.  The objective of the scheme to defraud Plaintiffs, which occurred throughout the period September 2014 until present date, was to gain unauthorized access to their competitors accounts, and collect unauthorized overcharges and  fees, disguised in overcharges such as trade processing fees and transaction fees to which the Vision defendants and beneficiaries were not entitled to.

160.  The ruse of risk management services, for which upon belief no legitimate contract existed, were not necessary and were not lawfully rendered, violated exchange rules, were grossly negligent, were replete with errors and omissions, were performed by unqualified personnel, were fraudulently concealed, were not authorized by or disclosed to the customer as required under the CEA, were fraudulently billed, and were billed at excessive and unreasonable amounts, deliberately causing depletion of CTA's performance record and earmarked conflicts of interest.

161.  This objective necessarily required the fraudulent disguise and inclusion of overcharges, fees, trade processing fees and transaction fees, to be deducted in cash payments from Plaintiff's accounts, to be paid across interstate wires to Vision Defendants; and the fraudulent disguise and dissemination of customers and CTA's competitive trade secrets and trading strategies in violation of 18 USC 1831 across interstate wires to Vision defendants;

162.  All documents, communications, emails, letters, correspondence, transaction records, trade secrets, trading strategies and unauthorized fees and access in connection with unnecessary, unqualified, and unlawful access to customer accounts, throughout this pleading traveled through interstate wires ,emails, telephonic communications or mail and were delivered to, acquired from or received by Plaintiffs including in the Southern District of New York.

163.  Every fraudulent statement, and unauthorized fees and statements, and unauthorized  detailed herein involved at least one (1) use of the interstate mails or wire communications, including the e-mailing of false statements and concealment of financial records and concealment of Vision's unauthorized access to Plaintiff's CTA accounts, and unauthorized deduction of fees from customers and CTA"s account..

164. It was foreseeable to the Defendants that making false representations to Plaintiffs would trigger reliance by Plaintiffs on the false statements and concealments in furtherance of the scheme to defraud, including actually opening, maintaining and transferring funds, capital, assets, and property including intellectual property to ADMIS.

165. Every unauthorized fee and deduction at issue, and ever improper acquisition, use and profits of its competitors trade secrets, as listed in this Complaint, where Plaintiffs were induced to rely on the Defendants' false statements, were deducted or accessed from Plaintiff's commodities futures trading accounts using interstate mail and wire communications,

166. The fraudulent scheme detailed herein generated thousands of individual deductions and fees taken out of futures customer's accounts across interstate bank wires, and generated thousands of instances of where Defendants and their conspirators, unlawfully accessed, downloaded, copies, and acquired their competitors transaction records, financial information and trade secrets.

167. As detailed herein, the Defendants fraudulently concealed and disguised Visions' unauthorized access to customers and CTA's accounts and  fraudulently concealed and disguised these overcharges and fees, and using fraudulent communication, material misstatements, and omissions, that were submitted to Plaintiffs via interstate wires, email or telephonic communications related to each Plaintiff, customer or CTA discussed in this Complaint.

168. It was within the ordinary course of business for Defendant with their conspirators at Vision, to fraudulently conceal, misrepresent and improperly acquire their competitor CTA's trade secrets fraudulently conceal and mispresent trade processing and transaction fees to overcharge fees, from Plaintiffs confidential accounts through interstate wires and mail and unlawfully deplete CTA's performance records in unfair competition,

169. Moreover, the business of fraudulently gaining unauthorized electronic access to customer and CTA's financial accounts and trading records, seeking unauthorized fees and payments, and gaining an unfair competitive advantage by acquiring their competitor CTA's trading and risk management strategies, and providing unnecessary and unqualified services, impermissible by the CEA, by ADMIS and each of the Vision Defendants and the LCI Defendants at issue herein is

regularly conducted by to which each Vision defendant is not entitled and is achieved through the use of fraudulent communications sent via intestate wires and mail.

170.  In other words, discrete fraudulent misrepresentations, improper acquisition, use and profit from their competitors' CTA's trading accounts, fraudulent concealment of fees, deducting trade processing and transaction fees without customer's authorization, are instances of mail and wire fraud are a regular way of doing business for each of the defendants.

171.  The Defendants at the direction and with the knowledge and participation of their owners and managers, including Howard Rothman and Robert Boshnack, continue to overcharge fees, collect and deduct cash payments, improperly acquire their confidential trade secrets, fraudulently seeking unauthorized fees and payments, and gaining an unfair competitive advantage by acquiring their competitor CTA's trading and risk management strategies, and harm Plaintiffs and other similarly situated .customers and CTA's.

172.  Thus, ADMIS' commission of mail and wire fraud continues.

173.  As all of the Defendants named in the conspiracy agreed that they would use (and, in fact, did use) the mails in furtherance of their scheme to defraud Plaintiffs, to access, acquire, use and profit from  their confidential trading accounts, and deduct unlawful fees not permissible under the CEA, charging fees and performing unnecessary and unqualified services that are not permissible under the CEA, these defendants committed mail fraud, as defined in 18U.S.C. § 1341.

174.  As several of the Defendants named herein agreed that they would use (and, in fact, did use) emails and telephonic calls over interstate wires in furtherance of their scheme to defraud Plaintiffs by receiving payment for services that are not compensable under the Commodities Exchange Act, these Defendants committed wire fraud, as defined in 18 U.S.C. § 1343.

175.  Plaintiffs reasonably relied on the fraudulent representations received from LCI Defendants and Vision Defendants listed in detail above, including but not limited  the material representations that "*John from risk*" worked at ADM, and that LCI "*works with a division of ADM*" and that "the patch has fixed the problem" indicated above and Exhibit 1 and 4.

176. As the Defendants agreed to pursue the same criminal objective (namely, mail and wire fraud, and theft of trade secrets), they committed a conspiracy within the meaning of the RICO Act, 18 U.S.C. § 1962(d), and are therefore jointly and severally liable for Plaintiffs' damages.

## DAMAGES

177. As a result of the foregoing conduct alleged herein, Plaintiffs have suffered damages that includes without limitation, irreparable harm in loss of their confidential and trade secrets, financial losses in their trading accounts, depletion and losses in CTA's performance records, damages to their good will and other impacts to the their CTA careers, reductions to the financial trading account balances, financial losses to their property, livelihoods and investments in the futures industry, as well as other significant damages.   Plaintiffs Kumaran, NRCM. Customers 1-100 and CTA's 1-100 have also collectively suffered damages and financial harm in unauthorized fees and deductions, estimated to exceed $50 million in overcharges, being concealed to pay Vision its owners, employees and affiliates.

178. Defendant has wrongfully profited from its fraudulent conduct, and been unjustly enriched, and that by reason of the foregoing, the Plaintiffs have been damaged, suffered irreparable harm and been injured in their livelihoods, financial assets, economic advantages, business and property.

179. CTA's have also been harmed by the depletion of fair market competition, by the unlawful access to their trading  strategies by competitors Vision its owners, employees and affiliates. The wrongful conduct and misappropriation of Plaintiffs' trade secrets alleged herein will continue unless enjoined and restrained by this Court, and is causing and will continue to case great and irreparable injury to Plaintiff's livelihoods and business, and is causing and has caused Vision its owners, employees and affiliates to have improper advantages, positions, and rights in the marketplace to Plainitffs' detriment. Absent injunctive relief, further disclosure and use of Plaintiffs' trade secrets by Vision its owners, employees and affiliates, as well as ongoing depletion of performance records, and deduction of fees,   continues to irreparably harm to Plaintiffs confidential futures trading accounts.

180. The unlawful and unauthorized fees are ongoing and accumulating, causing ongoing financial damages and losses, depletion to account value and losses from Plaintiffs' accounts.

181. Furthermore, the far reaching pattern of fraudulent conduct by ADMIS evinces a high degree of moral turpitude and wanton dishonesty and disregard for the rights of others, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

## CAUSES OF ACTION

## COUNT I – COMMON LAW FRAUD

182. Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein

183. Defendant had actual, direct and constructive knowledge of the fraud and fraudulent scheme as fully alleged above.

184. Defendant and its agents, servants, employees and introducing brokers, had an affirmative duty to abide by the CEA, abide by the compliance rules and laws of Futures Clearing Members and their disclosure laws, and abide by the compliance NFA rules, regulations and requirements including the anti-fraud provisions.

185. ADMIS representations were false or required disclosure of additional facts to render the information furnished not misleading, including as required. Specifically and without limitation of ADMIS's obligations and material disclosure requirements, ADMIS as a Futures Clearing Merchant is obligated to the disclosure requirements under the CEA, including Paragraph 57.

186. Further, without limitation ADMIS is obligated under NFA Rule 2-4 9061 to not disseminate CTA"s confidential and trade secret records,  which states expressly that it is a NFA Compliance violation for NFA Members Felag and Vision owners, affiliates to obtain a CTA's trading records without their permission; and to abide by Federal Laws, under the Defend Trade Secrets Act;

187. The misrepresentations, fraudulent concealments and omissions,  were intentionally made by ADMIS in furtherance of their scheme to defraud Plaintiffs by inducing them to open accounts

at ADMIS, and then engaging in the scheme to disseminate their accounts for profit, to generate profits and income to Vision, and to engage in direct unfair market competition, by disseminating CTA"s accounts to other NFA members, and CTA's Vision, expressly prohibited under fair market place laws and other market place misconduct to create an unfair advantage to Defendants.

188. ADMIS misrepresentations were known to be false and were made for the purpose of fraudulently inducing Plaintiffs to open accounts, entrust funds, property and business to ADMIS under false pretenses, to continue to maintain accounts at ADMIS,  and to participate in the unlawful and fraudulent scheme to deduct unauthorized fees that are not compensable under the Commodities Exchange Act,  and to unlawfully disseminate of customer and CTA"s trade secrets and trading strategies, which is not permitted under the CEA and/or the Defend Trade Secrets Act; and to deplete the fair market competition and economic advantage of customers and CTA's, and Plaintiffs, as alleged herein.

189. The misrepresentations of fact made by the ADMIS include, but are not limited to, those material misrepresentations discussed in Count II *below* or as otherwise herein.

190. The scheme to defraud perpetrated by Defendant and its co-conspirators, was dependent upon a succession of material misrepresentations of fact, fraudulently concealments and omissions, by ADMIS, as outlined herein by which among other concealments, ADMIS  materially concealed, that substantial portion of ADMIS's futures clearing business, instead of being guaranteed by Archer Daniel Midlands, or ADMIS' own credit worthiness, instead is reliant upon significant personal financial guarantees, personal credit lines obtained from the owners of the disbarred Vision Financial Markets, Howard Rothman, Robert Boshnack and Vision affiliates.

191. The fraudulent concealment and omissions, were material and directly impacted the customer and CTA's, and violate the material obligations of disclosure of the FCM,  because in exchange for the secret financial guarantee from Vision's owners and affiliates, in express violation of the CEA, the Defend Trade Secrets Act, and other Federal laws, and its fraudulently without the customer and CTA's knowledge, consent, permission and authorization ADMIS are

(a)      unlawfully distributing customer and CTA' confidential trading secrets and futures accounts to Vision, who then set up a competing CTA, in direct unfair market competitions in violation of Federal law, privacy laws, and the Defend Trade Secrets Act;

(b)      unlawfully overcharging customers and CTA"s fees between 0.30 cents and $6.00 for compensation to unauthorized third parties and Vision amounting to over $10 million dollars a year, without the customers consent;

(c)      unlawfully permitting Vision to tamper with, extend and manipulate margin controls, liquidate accounts, place trades for customers, and engage in other manipulation of their competitors accounts in direct unfair market competition [16];

(d)       improperly acquire their competitors trade secrets, for use, profit, gain, engage in economic sabotage and direct unfair competition;

(e)      other misconduct alleged herein,

so that Defendant and its co-conspirators, can fraudulently secure business that violates the CEA, for their profit, gain and financial benefit;

192.  Plaintiffs reasonably relied upon such material misrepresentations, fraudulent concealments and omissions to their detriment in agreeing to open accounts at ADMIS, and transferring valuable money, property, assets, confidential information and  trade secrets to ADMIS therein.

193.  As a direct and proximate result of the defendants' fraudulent representations and acts, Plaintiffs have been damaged in its business and property as described herein. Defendant has wrongfully profited, received concrete benefits, from their willful, knowing participation fraud, with wanton disregard for their customers and CTA's rights, and have caused Plaintiffs substantial damages and irreparable harm.

194.  Defendant has wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm. As a results Plaintiffs have been damaged in accordance with the Damages  in Paragraph 177-180 and repeated herein. Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra in Paragraph 181 and repeated herein.

---

[16] CFTC 1.11 and 7 U.S. C.§ 2 (c)(v) .(IV) 15 U.S. C§ 78g (2) (A)(B), NFA 2-26 17CFR§1.57 (c.) §1.55 Part (k);

195.  Defendants conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

### COUNT II – FRAUD AND DECEPTIVE BUSINESS PRACTICES
**New York State General Business Law Section 349 et. seq. or in the alternative Illinois State General Business Law 815 ILCS 505 and 510**

196.  Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

197.  Defendant including through its agents, employees, servants, introducing brokers, and Co-Conspirators, made material misrepresentations or omissions which were likely to mislead a reasonable consumer in the Plaintiffs circumstances, commencing on, but not limited to the calendar year 2014 to present, including to customers and Plaintiff located in New York City, NY.

198.  Plaintiffs, and the consumer at large, have been injured as the result of Defendant's conduct.

199.  Defendant including through its agent, employees, servants, and introducing brokers, with intent to deceive, provided material misrepresentation and/or omissions,  failing to disclose the true amount of commissions and fees, to induce customers to open accounts with ADMIS, and fraudulently omitting to disclose and concealing the additional trade processing and transaction fees and other charges, added after account opening – in violation of the Commodities Exchange Act, to compensate Vision, and fraudulently concealing unauthorized deductions, totaling as much as $10 million dollars a year would be syphoned from their accounts to compensate Vision in violation of NFA 2-26/ CFTC 33 and CFTC 1.55 and NFA 2-29

200.  Defendant including through its agent, employees, servants, and introducing brokers, with intent to deceive, fraudulently concealed and deliberately misrepresented the margin policies and risk management policies and procedures, in violation of CFTC 1.11 and CFTC 1.55,  and other exchange law violations, specifically misrepresenting and concealing that the handling of margin calls had been delegated to Vision affiliates, owners and employees, and that risk management policies and the margin allowances in material violation of the Commodities Exchange Act

201. Defendant including through its agent, employees, servants, and introducing brokers, with intent to deceive, fraudulently concealed and deliberately misrepresented that ADMIS had delegated authority of handling margin calls, to Vision owners, employees and affiliates and that they were authorized, to

    a.  place trades on behalf of ADMIS customers and CTA's  account - <u>without the customers and CTA's knowledge, authorization and consent</u>;

    b.  liquidate ADMIS customers' and CTA's account - <u>without the customers and CTA's knowledge, authorization and consent</u>;

    c.  add buying power, extend or add credit to a ADMIS customer and  CTA's confidential account, <u>without the customers and CTA's knowledge, authorization and consent</u>; and/or

    d.  take other actions in their sole discretion, related to margin activity, <u>without the customers and CTA's knowledge, authorization and consent</u>;

202. The foregoing authorizations were in violation of the Commodities Exchange Act, and materially omitted in the publicly available customer agreement, which false represents such actions are to be provided in ADMIS' sole direction.

203. Defendant including through its agent, employees, servants, and introducing brokers, with intent to deceive, fraudulently concealed and deliberately misrepresented that ADMIS, knew it had materially deficient electronic platforms, knew it was using decades old technologies, incapable of handling all strikes in heating oil options, and was unable to monitor intraday valuation and margin calculation on derivatives that violated exchange rules, and posed significant and systemic risks to consumers,

204. Defendant including through its agent, employees, servants, and introducing brokers, with intent to deceive, fraudulently concealed and deliberately misrepresented that their risk management technologies and risk management policies were replete with known errors and omissions, and did not conform to exchange rules.

205. Defendant, including through its agent, employees, servants, and introducing brokers, with intent to deceive, fraudulently concealed and made deliberate misrepresentation in its  publicly

available consumer report and financial statements, in 2015, 2016, 2017, 2018 and 2019 to mislead consumers about its risk management policies and procedures, under Section 7 "Derivative Financial stating that "**requiring customers to maintain margin collateral in compliance with various regulatory guidelines**", and fraudulently omitting that it has outsourced margin collateral and risk management services to Vision, and that margin collateral is unlawfully being extended in violation of regulatory guidelines and extend credit in violation of rules and laws.

206.  Defendant, including through its agent, employees, servants, and introducing brokers, with intent to deceive, fraudulently concealed and made deliberate misrepresentation and intraday performance bond procedures, that were in violation of exchange rules, and were being outsourced to Vision, and that Vision was arbitrarily and in an ad-hoc fashion had authorization to tamper with margin controls on ADMIS's customer accounts, without their knowledge and consent.

207.  Defendant including through its agent, employees, servants, and introducing brokers, with intent to deceive,  is misrepresenting and fraudulently concealing that it has outsourced risk management services, to person(s) at Vision who are not qualified to handled margin and performance risk management services, and who have previously caused consumer losses of over $2million dollars and were previously  disbarred.

208.  Defendant, including through its agent, employees, servants, and introducing brokers, with intent to deceive, does not properly and professionally evaluate the risk management technologies, platforms, exchange compliance, and the quality of services of risk management person(s), gross negligence and errors and omissions, at Vision who have been unlawfully granted authority to handle margin on customer accounts, posing grave threats to the consumer, material violations of exchange rules so as to steer business to ADMIS.

209.  Defendant, including through its agent, employees, servants, and introducing brokers, with intent to deceive, materially concealed, omitted and failed to inform its customers, that it had outsourced risk management and margin handling, to the grossly negligent and unqualified management team of Vision, and the margin handling would be replete with errors and omissions, run on materially deficient electronic platforms.

210.  Defendant, with intent to deceive, materially concealed, fraudulently omitted and failed to inform its customers, that it has known limitations in performing margin calculations on heating oil options and cannot monitor risks where customer own 100% of the open interest in options, and materially lacks technology platforms to handle all options strikes in heating oil options, and cannot monitor intraday performance in derivatives in violation of exchange rules.

211.  Defendants, including through its agent, employees, servants, and introducing brokers,  with intent to deceive, failed to inform customers (a) that their confidential and proprietary trading strategies account information, trading strategies, and in the case of CTA's trade secrets, would be distributed to their competitors and Vision, in violation of the Defend Trade Secrets Act; (b) that customers have the right to opt-out of their confidential and private information being disclosed to Vision in accordance with federal privacy laws

212. Defendants including through its agent, employees, servants, and introducing brokers, employed the deceptive practices as detailed above to coerce its customers to opening accounts with ADMIS and then, secretively and fraudulently turned them over to Vision.

213.  Plaintiff customers, reasonably relied on the misrepresentations and false statements, in part because ADMIS is wholly owned by Archer Daniel Midland, and ADMIS and ADM are obligated to comply with rules and regulations, which prohibits false and misleading public disclosures. Defendants have gone to great lengths to enact a pattern of secrecy and deception to prevent consumers finding out that ADMIS is disseminating its customer accounts for Vision, a pattern of conduct that has proceeded in the market place for over five year undetected. Plaintiff customers, had no access to other public information that would have shown that the foregoing compliance violations and outsourcing, or the material failure to disclose credit lines from Vision, and material dissemination of customers' confidential trading accounts to its competitors.

214. That as the result of the foregoing misrepresentations and other material omissions, concealments and acts of fraud contained in this complaint, by the Defendant, its agents, employees, servants, and introducing brokers, Plaintiffs' customers were deceived by those

misrepresentations or omissions that as a result were fraudulently induced to open accounts at ADMIS, and Plaintiffs suffered damages and injury.

215.  In its scheme to fraudulently steer consumers to open accounts at ADMIS, Defendant its agents, employees, servants, and introducing brokers, engaged in materially deceptive practices and representations designed to, and which did, and which continue to, mislead customers into the belief that ADMIS is providing risk management and handling margin, when the accounts have been unlawfully outsourced to the grossly negligence and unqualified rogue risk management personnel of the disbarred Vision, with services replete with errors and omissions, violating exchange rules;

216.  In its scheme to fraudulently induce consumers to entrust property, funds and confidential information to ADMIS, Defendant its agents, employees, servants, and introducing brokers, have engaged in materially deceptive practices and representations designed to, and which did, and which continue to, mislead their consumers into the belief that ADMIS in its sole discretion, was handling risk management, and ADMIS had qualified personnel and suitable technological platforms, that ADMIS was maintaining their financial accounts in confidence, and that ADMIS was complying with exchange rules, regulations and laws, which it was not, and that Vision's grossly negligent and unqualified personnel would provide unnecessary services, replete with errors and omissions in violation of Federal law.

217.  The deceptive practices and representations made by the Defendant and its agents, employees, servants, and introducing brokers  have caused injury to the public at large. Defendant, its agents, employees, servants, and introducing brokers, have and continue to benefit, in amounts estimated to exceed $10 million dollars a year,  by its practice by fraudulently inducing customers to open accounts at ADMIS, and then overcharge fees and unauthorized charges, to compensate Vision, and disseminate the confidential financial records and trade secrets, in unfor market competition to Vision, without the customers knowledge authorization, consent and permission

218.  Defendants, through its custom and practice, rewarded those agents, employees, servants, and introducing brokers who knowingly participated in the scheme and persuaded customers to

open and maintain account at ADMIS, and penalized those agents, employees, servants, and introducing brokers who objected to the fraud, fees and other illegal activities, including but not limited to terminating their relationships with ADMIS as retribution.

219.  That each separate act and action by the defendants constitutes a separate violation of GBL Section 349 and 349(h) and in the alternative equivalent laws in other states.

220.  Defendant has wrongfully profited from their conduct and have caused Plaintiff damages and irreparable harm, as well as irreparable loss of its competitive advantage and loss of trade secrets to Vision, its owners, employees and affiliates. That by reason of the foregoing, the Plaintiffs have been damaged and injured in their business and property in an amount as yet to be determined, but collectively believed to be in excess of $50 million with the exact amount to be determined at trial;

221.  That by reason of the foregoing, the public at large and the consumer in general have sustained damages including but not limited to their rights of privacy, rights to opt-out, and rights to maintain the confidentiality of their financial accounts and irreparable loss of trade secrets and under Federal Law and the laws of New York State.

222.  Defendant has wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm. As a result of the foregoing Plaintiffs have been damaged in accordance with the Damages in Paragraph 177-180  and repeated herein. Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra in Paragraph 181 and repeated herein.

223.  Plaintiffs are entitled to an award against Defendants of damages, interest and reasonable attorneys' fees pursuant to GBL Section 349(h) and other equivalent laws.

224. Defendants conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

## COUNT III – FRAUDULENT INDUCEMENT OF CONTRACT

225.   Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

226.  Defendant had actual, direct and constructive knowledge of the fraud and fraudulent scheme as fully alleged above, Plaintiff reincludes the allegations and facts pled in Count I.

227.  Defendant and its agents, servants, employees and introducing brokers, had an affirmative duty to abide by the CEA, abide by the compliance rules and laws of Futures Clearing Members and their disclosure laws, and abide by the compliance NFA rules, regulations and requirements including the anti-fraud provisions.

228.  Defendant and its agents, servants, employees and introducing brokers,  in bad faith, willfully violated the CEA, CFTC, NFA rules, regulations, laws and Federal laws, engaged in conduct of misrepresentations, fraudulent concealment and omissions, as listed supra, to fraudulently induce customers to open accounts with deceptive ADMIS Customer Agreements.

229.  Plaintiffs reasonably relied on Defendant, its agents, servants, employees and introducing brokers' fraudulent representations in deciding entrust funds to open accounts at ADMIS.

230.  Reliant on the fraudulent representations, and deceived by the material omissions and fraudulent concealments, Plaintiffs were in fact induced to open futures trading accounts at ADMIS, and entrusted funds, business, property, intellectual property, capital and in the case of CTA's their careers and livelihoods with ADMIS.

231.  Defendant however knew their representations were false and they had been engaging in the fraudulent and illegal scheme since September 2014.

232.  The foregoing misrepresentations and omissions were material, because if Plaintiffs had known the representations were not true, or if the concealments were properly disclosed, Plaintiffs would not have chosen to open futures accounts at ADMIS, and would not have chosen to do business with ADMIS, and would not suffered the significant harm incurred to date. Defendant acted with wanton disregard for Plaintiffs' rights.

233.  Defendants, jointly and severally, have wrongfully profited and received concrete benefits from their fraudulent scheme  and have caused Plaintiffs damages and irreparable harm. As a direct and proximate result of the defendants' fraudulent representations and acts, Plaintiffs have been damaged in its business and property as described herein.

234.  As the contracts and agreements were procured and induced by fraud, Plaintiffs have the right to rescind the contracts in their entirety;

235.  Defendant has wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm. As a result of the foregoing, Plaintiffs have been damaged in accordance with the Damages supra in Paragraph 177-180 and repeated herein. Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra in Paragraph 181 and repeated herein.

236.  Defendants conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

## COUNT IV – AIDING AND ABETTING IN FRAUD

237.  Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

238.  This cause of action is pled in the alternative to Count I.

239.  Defendant had actual, direct and constructive knowledge of the fraud and fraudulent scheme as fully alleged above, Plaintiff reincludes the allegations and facts pled in Count I.

240.  Defendant and its agents, servants, employees and introducing brokers, had an affirmative duty to abide by the CEA, abide by the compliance rules and laws of Futures Clearing Members and their disclosure laws, and abide by the compliance NFA rules, regulations and requirements including the anti-fraud provisions.

241.  Defendant in bad faith, willfully violated the CEA, CFTC, NFA rules, regulations, laws and Federal laws, engaged in conduct of misrepresentations, fraudulent concealment and omissions, and permitted or instructed its introducing brokers soliciting accounts to also and therefore provided substantial assistance in aiding and abetting in the fraud, as listed supra.

242.  Defendant has wrongfully profited, received concrete benefits, from their aiding and abetting in fraud, and took substantive actions to enable the fraud to perpetuate and have caused Plaintiffs substantial damages and irreparable harm.

243.   Defendant has wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm. As a result of the foregoing, Plaintiffs have been damaged in accordance with the Damages supra in Paragraph 177-0180  and repeated herein. Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra in Paragraph 181 and repeated herein.

244.   Defendants conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

## COUNT V – CIVIL CONSPIRACY

245.   Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

246.   Defendants entered into an agreement with ADMIS, Vision employees, owners and affiliates, and Vision IB's and key NFA Insiders, to defraud dozens of customers and CTA's opening accounts at ADMIS engage in intentional violations of the CEA and Federal Law to (a) distribute customer and CTA' confidential trading secrets and futures accounts to Vision; (b) overcharge fees between 0.30 cents and $6.00 for compensation to unauthorized third parties; and (c) other misconduct alleged herein, so that ADMIS and conspirators could procure financial credit lines and guarantees from Vision's owners and support the futures industry; and operate an enterprise that violates the CEA, for their profit, gain and financial benefit; ("Agreement to Defraud").

247.   Defendants, individually and jointly acted in furtherance of their Agreement to Defraud, by, among other things, coordinating: (i) failing to audit Vision IB's in accordance with the minimum frequency requirements ; (ii) covering up and failure to enforce NFA compliance laws, as stated supra and otherwise above; and (iii) using the NFA Arbitration Forum, to cover-up fraud, and not enforce fair, expeditious and equitable procedures and justice, but a mechanism where the NFA could control, impede, obstruct and prejudice Plaintiff's rights, and procure an outcome to protect NFA and its conspirators, in the Agreement to Defraud.

248.    Defendants intentionally performed the actions set forth above.

249.    Defendant has wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm. As a result of the foregoing, Plaintiffs have been damaged in accordance with the Damages supra in Paragraph 177-180  and repeated herein. Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra in Paragraph 181 and repeated herein.

250.    Defendants conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

## COUNT VI– CIVIL RICO – U.S.C § 1962(c).

251.    Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

252.    Over a pattern of continuous conduct commencing in or around September 2014 until present date, ADMIS,  each individually playing a role, engaged in a scheme with  Vision's owners, employees and affiliates and a network of IB's from Vision, and key insiders at the National Futures Association, Tom Kadlec, and the NFA, formed an association-in-fact enterprise (the "Enterprise"), in exchange for financial benefits to Defendants, using predicate acts of wire fraud, mail fraud and fraud to steal, misappropriate and use Plaintiffs trade secrets under 18 USC 1831,  and engage in  money laundering to defraud new commodities futures customers and CTA, for their profit, gain and financial benefit.

253.    At all times relevant herein, the Enterprise engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

254.    The scheme involves using interstate wire and mail communications, and fraud and deceptive sales, to fraudulently induced new customers, CTA's start-ups including Plaintiff, to open commodities futures trading accounts at ADMIS, whereby, in violation of the law, while materially concealed, that Vision, its owners, affiliates, employees would (a) gain fully disclosed

access to their accounts and trade secrets in violation of 18 USC 1831  (b) would unlawfully deduct cash payments out of their accounts across interstate lines to make payments to Vision and (c)

255.   In furtherance of the Enterprise, the co-conspirators intended to and knowingly stole and, without Plaintiff's authorization, used, copied, downloaded, uploaded, photocopied, replicated, transmitted, delivered, communicated, or conveyed Plaintiffs  trade secrets.

256.   The co-conspirators also received, acquired, or possessed Plaintiffs trade secrets, knowing that they had been stolen, obtained, or converted without Plaintiffs authorization.

257.   The co-conspirators intentionally engaged in these acts to benefit ADMIS with the knowledge or intent that these acts would injure Plaintiffs.  ADMIS and the co-conspirators each agreed to further, facilitate, support, and operate the Enterprise. As such, the ADMIS and the co-conspirators conspired to violate 18 U.S.C. § 1962(c)

258.   The Enterprise, fraudulent sales and telephonic solicitations to open commodities trading account at ADMIS and disguise that (a) fees and overcharges would be funneled across interstate lines to make personal compensation to Vision's Defendants and others in the Enterprise (b) CTA's trading strategies and trade secrets, would be unlawful dissemination across interstate lines and improperly acquired by Vision Defendants and (c) and each of the Defendants individually and jointly permitted the Enterprise to operate, by their direct participation in the scheme to intentionally fail to enforce the CEA and NFA rules that prohibit the conduct, as alleged herein.

259.   Defendant directly acquired financial benefit from the scheme. The predicate RICO acts set forth herein were carried out on a continued basis for more than a five period, were related and similar and were committed as part of the ongoing scheme of Defendant, one or more of the Vision IB's  to fraudulently induce accounts to ADMIS and then unlawfully disseminate CTA's strategies to Vision Defendants, and unlawfully deduct cash and transfer it to Vision Defendants, and, if not stopped, such acts will continue into the future;

260.   Upon information and belief, this pattern of activity poses a specific threat of repetition extending indefinitely into the future, and continued to harm to the present day;

261.   Defendant fraudulently collected unauthorized fees and deductions, estimated to be more than $50 million dollars over five years, in violation of the Defend Trade Secrets Act, the Commodities Exchange Act, Federal and State law, and the CEA and transfer those funds, under false pretenses, and without the customer and CTA's knowledge and approval to Vision, its owners, affiliates and employees.

262.   The scheme therefore also underpins unlawfully money laundering Plaintiffs cash from its customers futures accounts, across interstate commerce, which directly depleted the profits of their accounts and the performance record of their trading activities, as well as stole the trading strategies. Defendant knew that the transaction involved such proceeds would be wired across interstate to Vision owners and affiliates and made persistent and repeated attempts to fraudulently conceal. Vision IB and ADMIS, enabled by Defendants, intended to promote the carrying on of the specified unlawful activity and knew the transaction was designed to conceal or disguise the nature, location, source, ownership, or control of the proceeds -  namely Rothman and Boshnack.

263.   Plaintiffs have been damaged as a direct and proximate result of a violation of the Racketeering Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1961-1968) ("RICO") and by reason of this conspiratorial conduct whereas Plaintiffs have been induced to open accounts at ADMIS, and unwittingly contribute and disclose trades secrets, assets, capital, property, goodwill, and irreparable loss of competitive trade secrets to Vision as a result of Defendants' unlawful conduct described herein.

264.   As a direct and proximate result of racketeering activities and violations of 18 U.S.C. § 1962(c) by the co-conspirators, Defendant has wrongfully profited from their civil conspiracy and have caused Plaintiffs economic damages and irreparable harm, including, but not limited to, injuries in the Southern District of New York in an amount to be proven at trial.

265.   The actions of the co-conspirators constitute racketeering activities in violation of 18 U.S.C § 1832. This pattern of activity poses a threat of continuing because Defendants are continuing to proceed with the fraudulent activity, overcharging of fees, dissemination of customers confidential financial trading accounts, dissemination of trade secrets, and other unlawful conduct;

266.   The racketeering activities and violations of 18 U.S.C. §1962(c) has caused and will continue to cause Plaintiffs irreparable and substantial injury and therefore cannot be fully redressed through damages alone. An injunction prohibiting Defendants from further acquisition, disclosure, use, and possession of the Plaintiffs trade secrets is necessary to provide Plaintiffs with complete relief.

267.   If the co-conspirators were permitted to continue to engage in their racketeering activities and violations of 18 U.S.C.§1962(c), Plaintiffs and all future Plaintiffs will and are being irreparably harmed and the economic damages to Plaintiffs will be difficult to quantify. The aforementioned acts of the Co-Conspirators were done willfully, with malice toward Plaintiffs and with wanton disregard for their rights;

268.   Defendants are jointly and severally liable to Plaintiffs and Plaintiffs are entitled to recover from each treble damages sustained, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

269.   Defendant has wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm. As a result Plaintiffs have been damaged in accordance with the Damages in Paragraph 177-180 and repeated herein. Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra in Paragraph 181 and repeated herein.

270.   Defendants conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

### COUNT VII - CIVIL RICO -  U.S.C. § 1962(d)

271.  Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

272. The co-conspirators have intentionally conspired and agreed to directly and indirectly participate in the affairs of the Enterprise through a pattern of racketeering activities in violation of 18 U.S.C § 1832, as described in Count VI

273.  The co-conspirators knew that their actions constituted a pattern of racketeering activities and agreed to those actions in furtherance of, and for the benefit of the Enterprise, as described in Count VI

274.  The actions of the Co-Conspirators constitute a conspiracy to violate 18 U.S.C § 1962(c), in violation of 18 U.S.C § 1962(d).

275.  As a direct and proximate result of racketeering activities and violations of 18 U.S.C. § 1962(d) by the co-conspirators, Plaintiffs have suffered economic damages throughout the world, but not limited to, injuries in the Southern District of New York; in an amount to be proven at trial.

276.  Defendants are jointly and severally liable to Plaintiffs and the aforementioned acts of the Co-Conspirators were done willfully, with malice toward Plaintiff entitling Plaintiff to treble damages, attorneys' fees, and costs

277.  Defendant has wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm. As a result Plaintiffs have been damaged in accordance with the Damages in Paragraph 177-180 and repeated herein. Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra in Paragraph 181 and repeated herein.

278. Defendants conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

## COUNT VIII – MISAPPROPRIATION OF TRADE SECRETS DTSA

279.  Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

280.  Plaintiff Kumaran's and other CTA's transaction records, trading strategies and risk management strategies constitute competitive commercially sensitive information, including trade details, formulae, compilations, programs, methods, techniques, or processes, that give them an economic advantage are trade secrets are (1) non-public information; (2) protected by reasonable measures; and (3) and which derive independent economic value, actual or potential, from not being known to other persons, who can obtain economic value from its disclosure or use. of the

information.  Plaintiffs have maintained this information in confidence and it is not generally known to other persons or the public who could obtain economic value from the disclosure or use of such information.

281.   Plaintiffs took and takes reasonable measures to maintain the secrecy of its trade secrets. Such measures include, but were not limited to: (1) limited access to confidential information; (2) requiring third-parties to execute strict non-disclosure agreements before being allowed to access the information; and (3) requiring passwords for access to such information.

282.   Defendants misappropriated trade secrets by deliberate actions which include but not limited to: (1) acquisition of Plaintiff's trade secrets using improper means, including by fraudulent inducement of trading account, violations of duties and obligations under the CEA, fraudulent sales and telephone solicitation, and fraudulent concealment of Vision's access to CTA's strategies; (2) Defendants breach of the CEA, NFA Rules, CFTC Rules, compliance duties and Federal laws and confidential relationship and obligations to maintain the secrecy and restrictive covenants of customer trade secrets; (3) ongoing use and profit by Defendants, in interstate commerce. in direct competition and to cause economic harm,  and their conspirators own economic benefit without the express or implied consent of Plaintiffs; all in violation of the Defend Trade Secrets Act  "DTSA".

283.   Defendants have wrongfully profited from their misappropriation and have caused Plaintiff Kumaran and CTA's damages and irreparable harm. in loss of their confidential and trade secrets to their competitors, and depletion of their competitive advantage, and reduction in their performance track record by Vision, and affiliates Vision Investment Advisors.

284.   The wrongful conduct and misappropriation of Plaintiff's trade secrets alleged herein will continue unless enjoined and restrained by this Court, and will cause great and irreparable injury to Plaintiff's livelihoods and business, and it could cause Vision Defendants to have improper advantages, positions, and rights in the marketplace to Plainitiffs' detriment. Absent injunctive relief, further disclosure and use of Plaintiff's trade secrets by Vision Defendants would irreparably harm to Plaintiffs.

285.   Defendant has wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm. As a result Plaintiffs have been damaged in accordance with the Damages in Paragraph 177-180 and repeated herein. Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra in Paragraph 181 and repeated herein.

286.   Defendants conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

### COUNT IX – MISAPPROPRIATION OF TRADE SECRET MISAPPROPRIATION  - NEW YORK LAW
**Against all Defendants**

287.   Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

288.   Plaintiffs trade secrets, trading strategies and risk management strategies constitute competitive commercially sensitive information, including trade details, formulae, compilations, programs, methods, techniques, or processes, that give them an economic advantage are trade secrets,  that derive independent economic value from not being generally known to the public or other persons who can obtain economic value from the trade secrets' disclosure.

289.   Plaintiff has taken reasonable measures to protect the secrecy of Plaintiffs trade secrets, and includes by reference Paragraphs 280-284 above,

290.   The co-conspirators intended to and knowingly stole and, without authorization, acquired, used, used for competing trade activities, in their affiliates, profited from, referred to, obtained guidance from, in unfair competition, disclosed, copied, downloaded, uploaded, replicated, transmitted, delivered, communicated, conveyed and Plaintiffs' trade secrets.

291.   The co-conspirators acquired, used or disclosed Plaintiffs trade secrets, knowing that they have been stolen, obtained, or converted without Plaintiff's authorization. The co-conspirators intentionally engaged in these acts to benefit Vision Defendants with the knowledge or intent that these acts would injure Plaintiffs.

292.   As a direct and proximate result of violations of New York law, by the co- conspirators, Plaintiff has suffered economic damages both domestically and abroad, including, but not limited to, in the Southern District of New York in an amount to be proven at trial but exceeding $75,000.

293.    The aforementioned acts of the Co-Conspirators were done willfully, with malice toward Plaintiffs. Based on the willful and intentional misappropriation of Plaintiffs' trade secrets : (1) Defendants should be enjoined from any further use and/or disclosure of Plaintiffs' trade secrets until such time that no further commercial advantage that would be derived from the misappropriation of Plaintiff's trade secrets; (2) Plaintiffs should be awarded damages including actual losses and a disgorgement of unjust enrichment caused by the misappropriation ; (3) an equitable accounting  for  all profits or benefits arising out of such breach (4) exemplary damages including  but  not  limited to all special, indirect, punitive, consequential or other damages; and (5) all other remedies in equity and law, including recovery of its costs and legal fees under New York law

294.   As a result of Defendants' misappropriation, Plaintiffs have suffered actual damages and Defendants have been unjustly enriched..

295.   Defendant has wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm. As a result Plaintiffs have been damaged in accordance with the Damages in Paragraph 177-180  and repeated herein. Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra in Paragraph 181 and repeated herein.

296.   The wrongful conduct and misappropriation of Plaintiff's trade secrets alleged herein will continue unless enjoined and restrained by this Court, and is causing and will continue to case great and irreparable injury to Plaintiff's livelihoods and business, and is causing and has caused Vision its owners, employees and affiliates to have improper advantages, positions, and rights in the marketplace to Plaintiffs' detriment. Absent injunctive relief, further disclosure and use of Plaintiff's trade secrets by Vision would irreparably harm to Plaintiffs.

297.   Defendants conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

## COUNT X – INTERFERENCE IN ECONOMIC ADVANTAGE

298.   Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

299.   Plaintiffs Kumaran and CTAs  had a reasonable expectation of deriving income from acting as a CTA and forming a commodities hedge fund with competitive options strategies throughout the world and/or careers as CTA's.

300.   Defendant was aware that Plaintiff Kumaran and CTA's had a reasonable expectation of deriving income from acting as a CTA and forming a commodities hedge fund with competitive options strategies throughout the world.

301.   Defendants actions have prevented, and obstructed and otherwise irreparable harmed Plaintiff CTA's and Kumaran from fully maximizing its economic advantage as a CTA.

302.   Defendant has wrongfully profited from their interference with economic advantage and have caused Plaintiff damages and irreparable harm as a result of Defendants interference with Plaintiff CTA and Kumaran's economic advantage;

303.   Defendant has wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm. As a result Plaintiffs have been damaged in accordance with the Damages in Paragraph 177-180  and repeated herein. Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra in Paragraph 181 and repeated herein.

304.   Defendant's conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

## COUNT XI – UNJUST ENRICHMENT

305.   Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

306. Defendants have unlawfully gained based upon the defendants' fraudulent misrepresentations.

307.   Plaintiffs business, fees, commission, property, funds, intellectual property, assets and other financial benefits constitute a benefit which the Defendant aggressively sought and voluntarily accepted.

308.   Defendant wrongfully obtained financial benefit from Plaintiffs through the fraudulent scheme detailed herein, whereas Plaintiffs have been damaged and suffered irreparable harm.

309.   Defendant has been unjustly enriched by receipt of these wrongfully induced financial benefits from Plaintiffs.

310.   Defendants' retention of these wrongfully induced financial benefits, payments, profits and other financial benefits would violate fundamental principles of justice, equity, and good conscience. that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

311.   Defendant has wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm. As a result Plaintiffs have been damaged in accordance with the Damages in Paragraph 177-180 and repeated herein. Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra in Paragraph 181 and repeated herein.

312.   Defendant's conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

## COUNT XII – RECISSION

313.   Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

314.   As alleged in herein, through a pattern of fraudulent conduct, misrepresentations, concealments and omissions, ADMIS, its agents, employees, servants and introducing brokers. fraudulently induced the ADMIS Customer Agreement.

315.   As stated in Paragraphs 50-157, ADMIS made material representations, that were required to be disclosed under law and the CEA, to induce Plaintiff to open a Customer Agreements.

316. Plaintiff reasonable relied on the fraudulent representations, misstatements and to its detriment was induced to entrust funds, property and its CTA business to ADMIS.

317. The misrepresentations were material, and were a substantial factor and substantially contributed to Plaintiffs decision to manifest assent to the Customer Agreement. The false representation of material facts were made with the knowledge of its falsity and intent that it shall be acted upon, and which is acted upon to the injury of the other contracting party, constitutes such fraud. Fraud in the inducement of a contract renders the contract voidable at the election of the injured party.

318. The contracts were void, also due to the impossibility of performance and the doctrine of commercial frustration. The grossly negligent errors and omissions, documented herein, were not foreseeable at the time the parties entered into the contract, were not bargained for and materially obstructed and impeded performance and results in substantial harm and financial losses to Plaintiff. Further, the fraud

319. The contracts were also voidable, due to the illegality of the provisions, and the material failure to abide by the law, regulations. Since the ADMIS agreements are contract that involve the performance of illegal acts they are also deemed void and unenforceable. Further contracts based on legitimate subject matter that are performed in an unlawful manner are also unenforceable.

320. Lastly, ADMIS contracts were construed for an illegal purpose, and are contrary to public policy to engage and outsource to a disbarred Vision that was order to exit the futures industry. Contracts for an illegal purpose or contrary to public policy are not enforceable.

321. For the foregoing reasons, Plaintiff seeks complete and full recission of the ADMIS Customer Agreement, and all associated documents.

322. Plaintiff is entitled to damages and full restitution of its position prior to the agreement, including but not limited to all its losses and costs associated with the fraudulent inducement.

323. Defendant has wrongfully profited from its conduct and has caused Plaintiffs damages and irreparable harm. As a result Plaintiffs have been damaged in accordance with the Damages in

Paragraph 177-180 and repeated herein. Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra in Paragraph 181 and repeated herein.

324.   Defendant's conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

### COUNT XIII – BREACH OF CONTRACT

325.   Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

326.   In the alternative to Count XII, Plaintiff pleads material breach of contract and impossibility of performance.

327.   If not rescinded, ADMIS and Plaintiffs had a valid customer agreement.

328.   Plaintiff performed its duties under the contract.

329.   ADMIS has materially breached the agreements, including but not limited to Section 11, violated of the CEA, NFA, CFTC rules, regulations and requirements, and other provisions listed in Paragraphs 83-85 and otherwise herein, with gross negligence, replete with errors and omissions

330.   The ADMIS agreements are void-under-law, illegal, contract is enforceable.  The unlawful, fraudulently concealed outsourcing of risk to unqualified division of Vision, also was a material breach of contract. As stated herein the breaches also included violation of exchange laws in margin calculations.

331.   The breaches were material and rendered performance impossible.

332.   Since ADMIS has materially breached the contract, the contract is void under law, it may not enforce the contract, take advantage of the terms of the contract that benefit it, or recover damages under it, including but not limited to limitation on damages, waiver of jury trial and other provisions therein.

333.   Defendant has wrongfully profited from its breaches and has caused Plaintiffs damages and irreparable harm. As a result Plaintiffs have been damaged in accordance with the Damages in

Paragraph 177-180 and repeated herein. Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra in Paragraph 181 and repeated herein.

334.  Defendant's conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

## COUNT XIV – GROSS NEGLIGENCE / NEGLIGENCE / BREACH OF DUTYOF CARE

335.  Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

336.  Defendant had a duty as a Futures Clearing Merchant to abide by the rules of the CEA, NFA and CFTC and the other laws of the exchange. Those exchange rules included were but not limited to compliance with the intraday margin requirements of performance bond, CME 930, 980 and 982, as well as the  requirements to have electronic platforms capable of monitoring risk and markets on an intra-day basis, and under CFTC 1.11 to implement a risk management program, with qualified personnel and properly disclosed to the regulator and customers.

337.  Defendants knew both them and their unlawfully outsource had materially deficient electronic platforms, knew they had

338.  ADMIS, knew it had materially deficient electronic platforms, knew it was using decades old technologies, incapable of handling all strikes in commodities derivatives options, and was unable to monitor intraday valuation and margin calculation on derivatives that violated exchange rules, and posed significant and systemic risks to consumers,

339.  The errors and omissions included by reference in Exhibit 2, demonstrated egregious inaccuracies that had wanton disregard for the rights of others and were distinguished from the failure to exercise ordinary care. ADMIS errors and omissions in derivatives were not a careless mistake, but were so extremely careless that it was equivalent to recklessness.

340.  Defendant purported retention and illegal outsourcing of unqualified services of Vision management that had also caused over $2.1 million dollars of customers losses, also constituted gross negligence.

341.   Defendant has wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm. As a result Plaintiffs have been damaged in accordance with the Damages in Paragraph 177-180 and repeated herein. Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra in Paragraph 181 and repeated herein.

342.   Defendant's conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

### COUNT XV – BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

343.   Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

344.   In the alternative to Count XIII, and in the case of Recission of the Contracts, Plaintiff pleads in the alternative Breach of Duty of the Covenant of Good Faith and Fair Dealing.

345.   Defendant had a duty to act in good faith and in fair dealing, and a duty to apply with applicable laws, rules and regulations, and to conduct its operations

346.   Plaintiff made good faith attempts to reach out to ADMIS on numerous times before, during and after the trading and made repeated requests to understand and request information about the risk management policies and procedures.

347.   At all times, ADMIS acted with fraud and deceit, made material representations, obscured, obfuscated, avoided, and deliberately withheld information, even at material times of financial implication to Plaintiff, and in bad faith, fraudulently concealed that risk management policies and procedures were outsources to Vision, its employees, owners and affiliates, and engaged in other dishonorable conduct alleged herein.

348.   ADMIS's conduct was bad faith, and violated the principles of just and equitable trade, as alleged in the Complaint and Exhibits incorporated herein.

349.   ADMIS acted with bad faith and with deliberate intent to circumvent their independent obligations under the CEA to (i) deprive and cause irreparable harm to their loss of trade secrets and economic commercial advantage (ii) deprive and/or significantly reduce Plaintiffs'

performance record and compensations from their trading activities and (iii) and bonuses and other deprivation of commercial benefits that were relied upon as consideration of the bargain.

350.   Defendant has wrongfully profited from its fraudulent conduct and has caused Plaintiffs damages and irreparable harm. As a result Plaintiffs have been damaged in accordance with the Damages in Paragraph 177-180 and repeated herein. Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra in Paragraph 181 and repeated herein.

351.   Defendant's conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for relief and respectfully requests that the Court enter judgment against Defendant as follows:

a.      Recission in the entirety of the ADMIS Customer Agreement, including all exhibits, policies, addendums, subparts and appendices;

b.       Damages in the form of disgorgement of all profits gained by each Defendants from the fraudulent conduct from the accounts fraudulently induced hereunder;

c.      Disgorgement of all fees and profits unlawfully gained from the activity, estimated to be not less than $50 million dollars to be repaid to each any every Customer and CTA harmed;

d.      Restitution, unjust enrichment, and disgorgement of profits from Defendant, its agents, servants, employees and introducing brokers, resulting from the fraudulent scheme, and including misappropriation of Plaintiff's trade secrets;

e.      Entry of an order that restrains and preliminarily enjoins, and a Final Order that permanently enjoins, Defendant and their agents, servants, employees, introducing brokers, service providers, attorneys, and all persons acting in active concert or participation with them, from the unauthorized acquisition, disclosure, use, duplication, or distribution of the Plaintiffs' trade secrets;

f.      Damages calculated as by loss of property,  assets, livelihood and liberty, including loss of businesses, loss of CTA revenue, and intellectual property, in an amount to be determined at trial;

g.      Damages in the form of loss of capital, loss of income, loss of economic advantage, interruptions to business, costs of development, economic interruption, economic interference, disruption and delays, royalties, irreparable losses for trade secrets in an amount to be determined at trial;

h.      Damages in the amount of all reimbursement of all financial losses and reductions of economic advantage, for all commodities trading accounts involved in the scheme;

i.      Exemplary damages including  but   not   limited to all special, indirect, punitive, consequential or other damages;

j.      Treble damages as provided in 18 U.S.C. §§ 1964(c) and 1964(d);

k.      Attorney Fees, Costs and Expenses of this action;

l.      Post and Pre Judgment Interest;

m.      All other relief, remedies and rights available in law and equity as this Honorable Court deems just and proper;


PLAINTIFF DEMANDS TRIAL BY JURY

In accordance with ECF Rule Addendum  Dated April 1, 2020 and Covid 19, this Pleading is signed and filed electronically on May 18, 2020


Electronically Signed

//S//Samantha Siva Kumaran      *Samantha Sivakumaran*

Dated: New York, New York

May 18, 2020.